**In re MOFFITT, ZWERLING & KEMLER, P.C.**

**Misc. No. 93–0006–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 12, 1994.

Gordon D. Kromberg, Asst. U.S. Atty., Alexandria, VA, for U.S.

Arthur R. Mathews, Craig M. Blackwell, Wilmer, Cutler & Pickering, Washington, DC, for petitioners.

1. The earlier chapter of this proceeding is chronicled at *In re Moffitt, Zwerling & Kemler, P.C.,* 846 F.Supp. 463 (E.D.Va.1994), *appeal dismissed,* No. 94–5167 (4th Cir. June 28, 1994). Only those facts necessary for context and the

### MEMORANDUM OPINION

ELLIS, District Judge.

█ The question presented in the final chapter of this novel criminal forfeiture proceeding is whether the government can use a criminal forfeiture statute, 21 U.S.C. § 853, to reach the proceeds of drug trafficking when those proceeds were used by the drug trafficker to pay legal fees and the law firm spent the fees prior to the entry of the forfeiture order. More particularly, the question may be stated as follows:

> Can the government, in such a criminal forfeiture proceeding, require a law firm to pay the government a sum of money equal to a cash legal fee the law firm received from a client when:
>
> (i) a court ordered the forfeiture of the legal fee, having determined the cash involved constituted proceeds from drug trafficking;
>
> (ii) a court also determined that the law firm had no right, title or interest to the legal fees because it was not reasonably without cause to believe the fee was subject to forfeiture; and
>
> (iii) it appears that the law firm deposited the cash legal fee in its general account and spent the account before the date of the entry of the forfeiture order.

### I [1]

William Paul Covington ("Covington") trafficked in cocaine and marijuana in northern Virginia for several years. Federal authorities eventually became aware of the operation and, by the summer of 1991, began to seize Covington's assets for forfeiture.[2] Covington was represented at this point by the law firm of Phillips, Beckwith and Hall. In August 1991, Covington sought to retain the law firm of Moffitt, Zwerling and Kemler, P.C. ("the Law Firm") as his new counsel. The Law Firm informed Covington that he

resolution of the question presented are set forth here.

2. Those assets are identified in *Moffitt,* 846 F.Supp. at 465–66.

would need to provide fees up front in the amount of $100,000. Covington brought a total of $103,800 in cash to the Law Firm on August 23 and August 24, 1991. The Law Firm told Covington that it would hold the extra $3,800 to cover expenses.

The Law Firm's partners filed Currency Transaction Reports, or Forms 8300, disclosing the receipt of the $103,800. These forms require identification of the entity from whom the cash is received. In this instance, the Law Firm, on attorney-client privilege grounds, chose not to disclose Covington's identity on the forms it filed.[3]

The government was wholly unaware of Covington's $103,800 cash payment to the Law Firm until November 1991, when government agents secured the cooperation of William "Junior" Atkinson, one of Covington's major customers. Covington, it appears, needed cash to pay the Law Firm's retainer, and sought out Atkinson to collect on a $32,000 debt owed by Atkinson for past drug transactions. Thus, the government learned through Atkinson in November that Covington had transferred a large amount of cash to the Law Firm. Because the government was unable to obtain conclusive evidence of Covington's payment to the Law Firm, the $103,800 in fees was not specifically addressed either in the original indictment of Covington on October 30, 1991 or the superseding indictment of January 9, 1992. Both indictments, however, contained a forfeiture count broadly phrased to cover "any and all properties constituting, or derived from, proceeds the defendants obtained, directly or indirectly, as a result of a conspiracy."

The government did not obtain further evidence of the fees paid by Covington until February 1992, when government investigators received copies of the Form 8300s filed by the Law Firm, and the Currency Transaction Report forms from the Law Firm's bank, Burke & Herbert Bank, reflecting two deposits totalling $103,800. Those documents established that the Law Firm had received and deposited $103,800 in cash in late August 1991, but did not identify the source of the money. Thereafter, the government obtained a search warrant to examine the bank's records regarding the deposits. While the results of the search warrant further corroborated that the Law Firm had deposited the $103,800, the records seized did not tie that money to Covington.

On February 11, 1992, the government served a subpoena duces tecum on the Law Firm, seeking disclosure of the amount and form of payment received from Covington. The Law Firm moved to quash the subpoena on the ground that it would impair Covington's right to obtain fully effective counsel. Another judge of this division granted the motion to quash the subpoena on March 13, 1992. The government appealed this ruling, but the Fourth Circuit Court of Appeals dismissed the appeal as moot after the Law Firm agreed voluntarily to supply enough of the requested information to the government. *United States v. Covington,* No. 92–5201 (4th Cir. Oct. 15, 1992).

Strongly suspecting that Covington was the source of the $103,800 in cash deposited by the Law Firm in late August 1991, the United States Attorney for the Eastern District of Virginia elected to seek forfeiture of the fees and, on March 16, 1992, requested authorization to do so from the appropriate Department of Justice (DOJ) official. On May 12, 1992, the DOJ advised the prosecutors in the case that the request had been approved. That same day, the government filed a Bill of Particulars which specifically identified the $103,800 as property subject to forfeiture under Covington's indictment.

The next day, the government moved for an order to restrain the Law Firm from expending any monies received from Covington. The Court granted the order that day. This order enjoined the Law Firm from "transferring, conveying, liquidating, encumbering, wasting, secreting, modifying the terms of or disposing of any real or personal property or United States Currency described in the indictment returned in this

---

**3.** Though not yet settled in this circuit, two circuits reject the attorney-client privilege argument and require disclosure of the client's name on the form. *See Moffitt,* 846 F.Supp. at 466–67 n. 7.

case or in the Bill of Particulars, or any property traceable to such property."

The Law Firm maintains that by May 1992 it had only $3,695 of the money it received from Covington. The remainder of the $103,800 had been spent or disbursed before the entry of the restraining order. At the time Covington retained its services, the Law Firm had two bank accounts: a general operating account and an escrow account. The Law Firm initially deposited $93,800 of Covington's money in the general operating account, and placed the remaining $10,000 in the escrow account. In September 1992, the Law Firm moved a portion of Covington's money from the general operating account into a new savings account.[4] Law Firm records indicate that by the end of January 1992 the savings account had a zero balance and the general operating account had a slight negative balance. On that basis, the Law Firm contends that it no longer possessed any of Covington's money in either of these accounts at the time of the May 1992 restraining order. Meanwhile, the Law Firm gradually withdrew funds from the $10,000 in the escrow account in order to pay for expenses incurred in representing Covington. By the time the restraining order was entered in May 1992, the escrow account contained only $3,695.[5]

In August 1992, a conflict of interest compelled the Law Firm to withdraw as Covington's counsel.[6] With the aid of appointed counsel, Covington eventually pled guilty to three charges, specifically, a drug conspiracy in violation of 21 U.S.C. § 846, money laundering in violation of 18 U.S.C. § 1956, and a firearms offense in violation of 18 U.S.C. § 924(c). At sentencing on February 26, 1993, the Court, *inter alia,* ordered the forfeiture of virtually all of Covington's assets, including the $103,800 he paid to the Law Firm, contingent on the rights of any third parties to be claimed pursuant to 21 U.S.C. § 853(n).[7]

Thereafter, the Law Firm filed a petition under § 853(n), contending that the forfeiture was improper because the Law Firm was "reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B). After an evidentiary hearing, the Court found that the $103,800 paid to the Law Firm constituted proceeds of Covington's drug trafficking, and that the Law Firm had not met its burden of proving that it took the cash from Covington without reasonable cause to believe that it was subject to forfeiture. *Moffitt,* 846 F.Supp. at 468–69, 472–76. This ruling had the effect of leaving in place the February 1993 final order of criminal forfeiture as to the $103,800.[8]

The government has now proposed a final decree of forfeiture of the $103,800. The Law Firm opposes that decree on the grounds that, although the $103,800 is property subject to forfeiture, that property was largely dissipated well before the entry of

---

**4.** The Law Firm made several large transactions involving the general operating account in late 1991. On September 13, 1991, the Law Firm transferred $50,000 out of the general operating account in order to open a savings account. On September 25, 1991, the Law Firm made a loan of $25,000 from that savings account to one of its partners, William B. Moffitt. In October 1991, the Law Firm transferred a total of $21,000 from the savings account back into the general operating account.

**5.** The $3,695.95 in the escrow account included a small amount, $32.62, which Covington gave to the Law Firm prior to his surrendering to the authorities on November 1, 1991.

The Law Firm indicates that its expenses in the representation of Covington were $14,679.91, although apparently only $6,336.67 was taken from the escrow account to cover those expenses.

**6.** The circumstances surrounding the Law Firm's withdrawal are described in *Moffitt,* 846 F.Supp. at 467.

**7.** In addition to the forfeitures, Covington was sentenced to 262 months incarceration to be followed by five years of supervised release, and $150 in special assessments. A Rule 35(b) motion for reduction of sentence, based on substantial assistance to law enforcement authorities, has been filed.

**8.** The Law Firm appealed this decision to the Fourth Circuit Court of Appeals, which dismissed the appeal as interlocutory. *In re Moffitt, Zwerling & Kemler, P.C.,* No. 94–5167 (4th Cir. June 28, 1994).

the restraining order, and the Law Firm now possesses only $3,695 of that property.

## II

As this is a criminal forfeiture [9] proceeding under 21 U.S.C. § 853, analysis properly begins with an explication of the overall statutory scheme.[10] And, the proper starting point for this task is § 853(a), as it contains the core of the statute. It provides that a person convicted of violating a federal drug law punishable by imprisonment of more than one year must forfeit any property "constituting, or derived from, any proceeds the person obtained, directly or indirectly" from the crime. 21 U.S.C. § 853(a)(1).[11] Thus, under § 853(a), a defendant must forfeit criminal proceeds, and in addition, property which the government establishes to be derived therefrom. Section 853(b) clarifies that the term "property" includes both real and personal property, whether tangible or intangible. Significantly, the government has the benefit of a rebuttable presumption that property is forfeitable where a defendant acquired it during the period of the criminal activity and there is no likely source for it other than criminal profits or proceeds. 21 U.S.C. § 853(d).

Section 853 also contains a "substitution of assets" provision that applies when the criminal defendant disposes of his crime-related property prior to forfeiture. 21 U.S.C. § 853(p). Without this section, defendants could circumvent forfeiture by simply spending or transferring property when they believe a forfeiture order is imminent. Thus, § 853(p) provides that:

If any of the property described in subsection (a) of this section, as a result of any act or omission of the *defendant*—

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property *of the defendant* up to the value of any property described in paragraphs (1) through (5).

21 U.S.C. § 853(p) (emphasis added). Congress added this provision in 1986, confirming what most courts had already held,[12]

---

**9.** Historically, the law recognized two kinds of forfeiture, criminal and civil. *See Coffey v. United States*, 116 U.S. 436, 442–44, 6 S.Ct. 437, 439–41, 29 L.Ed. 684 (1886). Criminal forfeiture was part of a criminal's punishment. The forfeiture order was part of the defendant's sentence, and no separate proceeding was necessary. The forfeiture was *in personam* and based on the unlawful conduct of the defendant. In contrast, a civil forfeiture was an *in rem* proceeding. The item of property was treated as being "guilty," regardless of the innocence or guilt of the person. As a result, in civil forfeiture, the government was required to bring a separate action against the property. For forfeiture law's historical background, see *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680–83, 94 S.Ct. 2080, 2090–92, 40 L.Ed.2d 452 (1974); *United States v. Nichols*, 841 F.2d 1485, 1486–87 (10th Cir.1988); Reed & Gill, *RICO Forfeitures, Forfeitable "Interests," and Procedural Due Process*, 62 N.C.L.Rev. 57, 59–69 (1983).

**10.** A similar forfeiture scheme is found in the Racketeer Influenced and Corrupt Organizations (RICO) statute. 18 U.S.C. § 1963(a). The criminal forfeiture provisions in RICO and § 853 share a common origin and purpose, as well as

substantially similar language. It follows, therefore, as settled precedent confirms, that decisions interpreting the RICO forfeiture provisions are persuasive authority on the interpretation and application of § 853. *See United States v. Ripinsky*, 20 F.3d 359, 364 n. 6 (9th Cir.1994); *United States v. Amend*, 791 F.2d 1120, 1127 n. 6 (4th Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986).

**11.** The statute also requires forfeiture of any property intended for use in commission of the crime, and any interest in a continuing criminal enterprise. 21 U.S.C. § 853(a)(2)–(3). These are not at issue in the present matter.

**12.** Most circuits, including this one, had held that under the law prior to § 853(p)'s enactment, the defendant faced *in personam* forfeiture under § 853(a), reaching any of his assets, without resort to tracing. *See, e.g., United States v. Amend*, 791 F.2d 1120, 1127 & n. 6 (4th Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986); *United States v. Robilotto*, 828 F.2d 940, 948–49 (2d Cir.1987) (applying pre–§ 853(p) law); *United States v. Ginsburg*, 773 F.2d 798, 800–03 (7th Cir.1985), *cert. denied*, 475

namely that a criminal forfeiture order under § 853, as in traditional *in personam* forfeiture, reaches any of the defendant's assets, regardless of their source or whether they are traceable to criminal activity. *In re Billman*, 915 F.2d 916, 920 (4th Cir.1990), *cert. denied*, 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991). Section 853(p) enables the government, when pursuing forfeiture from the defendant, to avoid relying on the "derived from" phrase in § 853(a)(1), and to escape the difficulties of proving that particular assets are traceable to criminal proceeds. Thus, when seeking forfeiture from the criminal defendant, the government can seize either the criminal proceeds themselves under § 853(a) or any substitute assets under § 853(p). Only a moment's reflection is needed to see that this provision confers a significant and far-reaching forfeiture power on the government. Yet, conspicuous by its absence is any express, analogous power to reach the substitute assets of a transferee of forfeited property.

 The substitute assets provision is not the only part of § 853 designed to prevent defendants from circumventing anticipated forfeiture orders. Section 853(c) establishes that the "relation back" doctrine, developed in the law of *in rem* forfeiture,[13] applies under § 853.[14] Under this doctrine, the government is deemed to have title in the tainted property from the date of the illegal conduct. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627–28, 109 S.Ct. 2646, 2653, 105 L.Ed.2d 528 (1989).[15] As a result, where, as here, the defendant has transferred forfeitable property to a third party, the transfer may be void and the property "may be the subject of a special verdict of forfeiture and thereafter shall be forfeited to the United States." 21 U.S.C. § 853(c). Section 853(c) pertains to "property described in subsection (a)" of the statute, which, as noted, reaches both criminal proceeds and other property derived from, *i.e.* traceable to, such proceeds. Thus, property traceable to the criminal activity can be reached even in the hands of a third party transferee. But the third party may successfully oppose the *forfeiture through a petition* under § 853(n) by proving, by a preponderance of the evidence, either that the third party had a superior interest in the property at the time the defendant committed the crime, or that the third party was a bona fide purchaser reasonably without cause to believe that the property was subject to forfeiture. 21 U.S.C. § 853(n).

While subsections (a), (c), and (p) define the property set subject to forfeiture and thus constitute the heart of § 853, the statute also includes several ancillary measures that may be invoked in aid of effecting forfeitures. Thus, the government may seek restraining orders, injunctions, or warrants of seizure to

U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986) (overruling *United States v. Alexander*, 741 F.2d 962 (7th Cir.1984), and *United States v. McManigal*, 708 F.2d 276 (7th Cir.1983), *cert. granted and judgment vacated*, 464 U.S. 979, 104 S.Ct. 419, 78 L.Ed.2d 355 (1983)); *United States v. Conner*, 752 F.2d 566, 576–77 (11th Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). In the same vein, this circuit has since expressly recognized that in enacting § 853(p), Congress codified what was already implicit in § 853(a). *In re Billman*, 915 F.2d at 920.

**13.** *See United States v. Stowell*, 133 U.S. 1, 16–18, 10 S.Ct. 244, 247–48, 33 L.Ed. 555 (1890).

**14.** Section 853(c) provides that:

All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant

may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

**15.** The "relation back" doctrine, whether at common law or under statute, does not vest title in the United States automatically and without judicial decree. Instead, at the time the court orders the forfeiture, the relation back doctrine operates to vest title in the United States effective from the date of the criminal conduct. *United States v. 92 Buena Vista Avenue*, —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993). Though there was no majority opinion in *Buena Vista*, six Justices agreed on this point. —— U.S. at ——, 113 S.Ct. at 1135–37 (Stevens, J., plurality); *id.* at ——, 113 S.Ct. at 1138–39 (Scalia, J., concurring in judgment).

preserve the availability of the defendant's property prior to forfeiture. 21 U.S.C. § 853(e)–(f). And, after an order of forfeiture, a court may order the deposition of witnesses and the production of documents to "facilitate the identification and location of property declared forfeited." 21 U.S.C. § 853(m). A court may also "enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, or take any other action to protect the interest of the United States in the property ordered forfeited." 21 U.S.C. § 853(g).

This brief and somewhat sterile outline of the statute does not adequately convey the scope and nature of § 853 criminal forfeiture, which is more vividly illustrated through a series of hypothetical situations. Suppose, for example, that a drug trafficker accumulates cash through cocaine trafficking. The money is subject to forfeiture under § 853(a).[16] Suppose further that the drug trafficker uses the cash to purchase a new Jaguar. In this event, the government could compel forfeiture of the Jaguar as property derived from criminal proceeds under § 853(a), or alternatively, as substitute property under § 853(p). If the drug dealer disposed of the cash and the car prior to entry of the forfeiture order, the government could take any of his assets of an equivalent value in substitution under § 853(p). And significantly, the government would not be required to trace the substitute assets, that is, the government would not be required to show that the substitute assets were derived from or related in some way to the Jaguar or to the drug dealing. As this hypothetical illustrates, the government has far-reaching forfeiture powers against all of a defendant's property, by virtue of the substitute assets provision, § 853(p).

Consider next what happens when the drug trafficker transfers the Jaguar to a third party, say to his lawyer as recompense for legal services. In this event, the government, under § 853(c), could demand forfeiture of the Jaguar even from the lawyer. Section 853(c) plainly compels transferees of forfeited property to forfeit the transferred property itself. Of course, the lawyer would not have to surrender the Jaguar if she establishes under § 853(n) that she was a bona fide purchaser for value who was reasonably without cause to believe the Jaguar was subject to forfeiture.

But now assume the lawyer had sold or otherwise disposed of the car by the time of the restraining or forfeiture order, and assume further, that this lawyer owned other property including firm assets and bank accounts. This hypothetical situation is essentially similar to the instant case. Covington, a convicted drug trafficker, paid his lawyers, the Law Firm, $103,800 in cash earned from drug trafficking. Had the Law Firm kept the cash intact in its safe, there can be no doubt that it could be required to forfeit the money under § 853(c), just as the lawyer in the hypothetical would have had to give up the Jaguar. After all, by operation of the relation back doctrine, entry of the forfeiture order served to vest title to the Jaguar or the cash in the government, retroactive to the date of the criminal conduct. Like the Jaguar then, the money would have to be forfeited unless the Law Firm could show that it was a bona fide purchaser without cause to believe the money was subject to forfeiture. As the Law Firm failed to make this showing, it is unmistakably clear that had the Law Firm kept the cash intact, the money would be forfeited. As it happened, of course, the Law Firm did not keep the money intact; it deposited the money in its account and then spent it all, with the exception of $3,695. The central question in this case, then, is whether there is any provision of § 853 that enables the government to reach the Law Firm's assets other than the actual property, $103,800 in cash, received from Covington.

There is a visceral tendency to give a quick affirmative answer to this question. After all, once the forfeiture order issued, title to the $103,800 vested in the government retro-

16. In the event of a dispute over whether the money constituted drug trafficking proceeds, the government would have the benefit of a rebuttable presumption that it was so obtained if the defendant acquired it during the period of his illegal activities and no other likely source for it appears. 21 U.S.C. § 853(d).

active to the date of Covington's illegal conduct. So, in some sense, the Law Firm never had title to the money and if the Firm spent it, there is a visceral tendency to conclude that the Law Firm should be required to pay it back from the Firm's other assets. Yet, the viscera cannot be allowed to rule for it is crucial to note that the sole issue is whether the statute allows for the forfeiture sought here, not whether it seems fair or sensible to order forfeiture. If the power is not found in the statute, a court should avoid creating one by implication on policy grounds. The Supreme Court has explained why courts must refrain from policy making, however wise, by inventing implied powers to fill statutory lacuna:

> [T]he claim now asserted, though the product of a law Congress passed, is a matter on which Congress has not taken a position. It presents questions of policy on which Congress has not spoken. The selection of that policy which is most advantageous to the whole involves a host of considerations that must be weighed and appraised. That function is more appropriately for those who write the laws, rather than for those who interpret them.[17]

Of course, judges in the common-law tradition frequently and properly "legislate" in the course of deciding cases when they resort to interpretive techniques to fill statutory gaps. But some gaps are chasms too wide to be filled by judges using their common-law powers. These wider gaps, involving more far-reaching and fundamental issues of policy, are more properly suited to the legislative, not the judicial, arena. Judges tempted to make the leap across these chasms must avoid the temptation to do so lest they cross

the important, if unclear line that exists between principled but energetic judicial lawmaking and illegitimate usurpation of the legislative role. It must be recognized that the forfeiture laws confer extraordinary powers on the government, and "the fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do."[18] The Law Firm suggests that § 853 contains such an omission, unsuited to judicial repair, in that Congress enacted no provision requiring third parties who transfer or dissipate property subject to forfeiture to forfeit other, substitute property. In response, the government presents several arguments, each of which is separately addressed, seeking to establish that if § 853 does contain a gap, it is a small one, because § 853(c) in some manner requires the Law Firm to forfeit property other than the $103,800 in currency it accepted from Covington.

### III

In the broadest conceivable forfeiture statute, a third party, like the lawyer who no longer possesses the Jaguar received from the drug trafficker, would be required to forfeit any property of equivalent value, regardless of its connection to the car. This would be the case if § 853(p), the substitute assets provision, applied to third parties as well as to defendants. The government concedes that the statute does not go this far.[19] Such an interpretation of the statute would be untenable for several reasons. In the first place, transferees of forfeited property, such as the Law Firm, have not been convict-

---

17. *United States v. Gilman*, 347 U.S. 507, 511–13, 74 S.Ct. 695, 697–98, 98 L.Ed. 898 (1954) (footnote omitted) (holding that United States could not recover from its employee whose negligent driving resulted in governmental liability under Federal Tort Claims Act, in absence of statutory right of indemnity).

18. *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. at 1785, 1793–94, 85 L.Ed.2d 64 (1985) (finding that courts could not save mining claims filed on December 31 from extinguishment where statute required filing "prior to December 31").

19. The government concedes that § 853 does not require forfeiture of non-traceable assets in place of non-cash property dissipated prior to forfeiture. For example, let us assume Covington had paid the Law Firm with tickets to upcoming Washington Redskins' games worth $103,800 (not likely given the team's performance this year). After the season, when the lawyers had used the tickets and the Law Firm possessed no property traceable in any way to the tickets, the government concedes that § 853(c) would not permit the government to seek forfeiture of $103,800 of the Law Firm's other property, say its furniture or business machines.

ed of any crime, and thus § 853(c) cannot be read to impose on them the full *in personam* liability of traditional criminal forfeiture. Moreover, the existence of § 853(p) defies such a construction of the statute, for that provision plainly states that it applies only to the defendant. If § 853(c) by itself enables the government to obtain forfeiture with full substitution of assets from a third party, then § 853(p) is a misleading redundancy.[20]

## IV

To bridge the gap created by the absence of a § 853(p) applicable to transferees, the government focuses on the fact that the Law Firm received *cash* from Covington. There is, in the government's view, an important distinction between cash and other property under § 853, because all money is fungible and freely interchangeable. This unique feature of cash, according to the government, warrants construing the term "property" in § 853(a) and § 853(c) to mean that where the forfeited property is cash, the forfeiture can reach *any* cash the transferee has.[21] To accommodate this argument, the government asserts that the substitute assets provision in § 853(p) is necessary only in those instances where a defendant has dissipated or transferred crime-related assets other than money. Where the forfeited property is money, the provision merely reiterates what is already inherent in § 853(a) and § 853(c).[22]

■ The government's fungibility argument, while not without visceral appeal, is ultimately unconvincing, for it is unsupported, if not contradicted, by legislative history, prior precedent, and subsequent legislation. These sources, coupled with an analysis of § 853 as a whole, point persuasively to the conclusion that the only fungible property under § 853 is the defendant's property, whether money or otherwise, because only defendants face *in personam* forfeiture.

Statutory interpretation properly begins with the statute's language. *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Section 853's language does not distinguish between money and other kinds of property. In particular, there is no indication in the language of the substitute assets clause, § 853(p), that it is relevant only to non-cash property. To the contrary, the language of § 853(p) implies that the subsection applies to all property, including money. Thus, the statute provides for forfeiture of substitute assets of the defendant where the criminal proceeds have been "deposited" with a third party or "commingled with other property." 21 U.S.C. § 853(p)(2), (5). Money is the form of property most likely to be deposited or commingled.[23] Rather than distinguishing between money and other property, § 853(p) plainly states that all of the defendant's property is fungible, and the absence of such a provision applicable to third parties invites the inference that the opposite is true for the property of such parties.

Other legislation also contradicts the government's interpretation of § 853 as distinguishing between cash and other property. In 1992, Congress passed a statute which

**20.** *See Astoria Federal Savings & Loan Ass'n v. Solimino*, 501 U.S. 104, 112, 111 S.Ct. 2166, 2172, 115 L.Ed.2d 96 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof.").

**21.** The statutory definition of "property" neither invites, nor precludes this interpretation. 21 U.S.C. § 853(b).

**22.** The government posits other explanations for the existence of § 853(p), all in an attempt to show that the provision does not really imply that no such substitution of assets is available when the forfeiture is made by a third party like the Law Firm. Thus, the government has suggested that Congress enacted § 853(p) as an alternative and more expeditious way for the government to seize assets of the defendant that the government could otherwise obtain through the

ordinary process of executing the forfeiture judgment. The government also contends that property seized as a substitute asset under § 853(p) can be put to official use, whereas property levied with a writ of execution must be sold. While each of these points may be true, there is simply no basis in the statute's language or legislative history for concluding that Congress had any of these fine distinctions in mind in enacting § 853(p).

**23.** While this does not make the government's interpretation inconceivable, it does force the government to argue that the drafters of the statute chose an extremely opaque way of incorporating the distinction between money and other property into the statute.

expressly relieves the government of the need to identify or trace fungible property, such as money, in certain civil forfeiture cases. 18 U.S.C. § 984.[24] Section 984, which is plainly premised on money's fungibility, applies only to *in rem* forfeitures related to certain money laundering offenses. That Congress would explicitly employ the fungibility principle in one statute militates against reading it into another statute that makes no explicit mention of fungible assets. Put another way, § 984 shows that Congress, in writing statutes, knows well how to write statutory language that clearly and explicitly makes use of the fungibility of cash. The absence of this language in § 853 strongly implies that the criminal forfeiture statute, unlike its civil counterpart, does not treat cash differently from other property.[25]

Nor is § 984 the sole statute demonstrating that Congress does not share the government's interpretation of § 853. In 1986, Congress passed a statute imposing criminal forfeiture as a penalty for a variety of federal crimes. 18 U.S.C. § 982. That statute in-

corporates by reference certain provisions of § 853, including the substitute assets provision in § 853(p). In 1988, Congress amended § 982, providing that § 853(p) "shall not be used to order a defendant to forfeit assets in place of the actual property laundered where such defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense." 18 U.S.C. § 982(b)(2).[26] This statute renders implausible the government's interpretation of § 853 in this case. Assume a defendant in a money laundering case could show that he was a mere intermediary, and that he no longer possessed "the actual property laundered." In that event, the defendant would not have to forfeit non-cash property, such as his house or car, in lieu of the laundered money, because § 853(p) would not apply. At the same time, if, as the government argues, the fungibility principle should be read into § 853, it should be read into § 982(a)(1) as well.[27] As a result, the defendant, although an intermediary entitled to § 982(b)(2)'s exemption from

**24.** The statute provides, in relevant part, that:
(a) This section shall apply to any action for forfeiture brought by the Government in connection with any offense under section 1956, 1957, or 1960 of this title or section 5322 of title 31, United States Code.
(b)(1) In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution (as defined in section 20 of this title), or other fungible property—
(A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
(B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.
18 U.S.C. § 984.

**25.** Another court derived a similar implication from § 984. *See United States v. All Funds Presently on Deposit or Attempted to Be Deposited in Any Accounts Maintained at American Express Bank*, 832 F.Supp. 542 (E.D.N.Y.1993). In that civil forfeiture action pursuant to 18 U.S.C. § 981, the government sought to avoid having to trace commingled forfeited money. Since the case involved money laundering in violation of 18 U.S.C. §§ 1956 and 1957, the new statute on fungible property, § 984, would have relieved the government of any tracing requirement. Yet, in this case, the government was barred from using § 984 by its one-year statute of limitations. 21

U.S.C. § 984(c). The government argued that, even in the absence of § 984, it did not have to trace the property as long as the seized property "facilitated" the wrongdoing. The court rejected this argument because "[t]he clear implication of this statute [§ 984] is that *Banco Cafetero's* tracing analysis applies to forfeiture actions brought under Section 981; any other reading would render the above provisions superfluous since a provision for substitution would not be necessary if, as the government argues, the accounting techniques put forth in *Banco Cafetero* did not apply to money laundering forfeitures." *All Funds*, 832 F.Supp. at 557.

**26.** Congress amended § 982 again in 1990, adding the following qualification: "unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." Pub.L. No. 101–647, § 1403, 104 Stat. 4835.

**27.** Section 982(a)(1) provides, in pertinent part, that:

The court, in imposing sentence on, a person convicted of an offense in violation of section 5313(a), 5316 or 5324 of title 31, or of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

substitution of assets, would still have to forfeit any money he held, regardless of its source, in place of the laundered money. Section 982's language does not expressly suggest such a distinction between money and other property, and courts have never mentioned it in discussing the statute. *See United States v. Hendrickson*, 22 F.3d 170, 175 (7th Cir.1994); *United States v. Saccoccia*, 823 F.Supp. 994, 1005–06 (D.R.I.1993); *United States v. Floyd*, 814 F.Supp. 1355, 1363–64 (N.D.Tex.1993). In sum, just as § 982 does not implicitly or explicitly distinguish between money and other types of property, neither does § 853. Neither statute recognizes or makes use of the fungibility of money.

In support of its proposition that all money is fungible under § 853, the government cites a number of cases holding that, even prior to the enactment of § 853(p), a defendant could not avoid forfeiture by simply showing that he no longer had the money earned from crime. *United States v. Robilotto*, 828 F.2d 940, 948–49 (2d Cir.1987); *United States v. Amend*, 791 F.2d 1120, 1127 & n. 6 (4th Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986); *United States v. Ginsburg*, 773 F.2d 798, 800–03 (7th Cir.1985), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1985); *United States v. Conner*, 752 F.2d 566, 576–77 (11th Cir.1985), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985). All of these cases are distinguishable as each involved forfeiture by a convicted defendant, not forfeiture by a third party transferee. Moreover, the cases

together confirm that the key distinction within § 853 is not between money and other property, but between the defendant and third parties. While it is true that some of the opinions mention money's fungibility,[28] the decisive factor is the distinctive *in personam* nature of the defendant's liability. The Court of Appeals for the Fourth Circuit succinctly explained why the government may seize substitute assets of a defendant under criminal forfeiture:

> A RICO forfeiture pursuant to this statute is not an *in rem* proceeding against guilty assets. The forfeiture is, instead, an *in personam* proceeding against the defendant, and the forfeiture constitutes partial punishment for the offense. The government is not required to trace the proceeds of the RICO offense into a specific bank account in order to execute a forfeiture judgment. Instead, a forfeiture money judgment can be satisfied out of any of the defendant's assets.
>
> These principles are embodied in an amendment to the Act, 18 U.S.C. § 1963(m) [the RICO equivalent of § 853(p) ], which makes provision for the forfeiture of substitute assets....

*In re Billman*, 915 F.2d 916, 920 (4th Cir. 1990) (citations omitted), *cert. denied*, 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991).

The government's theory that all money is fungible has never been applied to a third party, such as the Law Firm, under § 853 or any other criminal forfeiture statute.[29] Even

---

**28.** *See, e.g., Ginsburg*, 773 F.2d at 802 ("Every dollar that the racketeer derives from illicit activities and then spends on such items as food, entertainment, college tuition, and charity, is a dollar that should not have been available for him to spend for those purposes.").

**29.** *See* 18 U.S.C. § 982; 18 U.S.C. § 1963. The parties have extensively addressed the case of *United States v. Delco Wire & Cable Co.*, 772 F.Supp. 1511 (E.D.Pa.1991), in which the defendant corporation pled guilty to violating RICO, and the court ordered forfeiture of all property derived from its racketeering activity. The government argued that this included $7.8 million that Delco had paid to Security Pacific Bank under a revolving credit agreement between the date of the indictment and the date of the forfeiture order. The court held that the government

had not proven that Delco derived the $7.8 million from racketeering, noting that "[i]n the absence of proof tracing the $7.8 million to illegal activities," the money was not covered by the forfeiture order. *Id.* at 1516. The government was never able to produce such proof. *See United States v. Delco Wire & Cable Co.*, Crim. Nos. 87–194–01, 87–194–02, 1992 WL 151762 (E.D.Pa. June 23, 1992).

The court in *Delco* never reached the question presented here. It is established in this case that Covington derived the $103,800 from drug trafficking, and consequently that amount is covered by the March 1992 forfeiture order. *Moffitt*, 846 F.Supp. at 468–69. The *Delco* court did not need to consider what would happen if the bank admitted that the $7.8 million was subject to forfeiture, but claimed that it no longer had *that* $7.8 million.

more telling, the government is unable to cite any instance in which that theory has been applied under a civil forfeiture statute.[30] The government has not explained why, if money is inherently interchangeable, the courts have developed extensive rules for tracing money in civil forfeiture cases.[31] The fungibility theory only appears in criminal forfeiture cases, and only in connection with forfeiture of defendants' property, because only the defendants' property, money or otherwise, is fungible. The limited legislative history regarding § 853(p) supports this understanding of the reasoning behind the statute, for it contains no mention of a distinction between money and other property, but instead reinforces the idea that the defendant is subject to *in personam* criminal forfeiture, and that other parties are not.[32]

■ In sum, the government's primary theory for recovering the entire $103,800

from the Law Firm must fail. In terms of the hypothetical used above, the statute treats money and the Jaguar alike. Section 853(c) cannot be read to contain a general rule that money merits different treatment because it is fungible and interchangeable.[33]

## V

■ In the alternative, the government argues that § 853(g) provides sufficient general authority for a court to order the Law Firm to pay $103,800 now, notwithstanding that the Law Firm has expended the cash received from Covington. In support of this, the government first reasons that the United States acquired title to the $103,800 under § 853(c)'s "relation back" doctrine, and as a result, the government can recover that amount from the Law Firm in a civil action for conversion under Virginia's common law.[34] Given this, the government contends

**30.** The government's reliance on *Philips Medical Systems International B.V. v. Bruetman,* 8 F.3d 600 (7th Cir.1993), for the proposition that money is fungible in civil forfeiture, is misplaced. The case did not involve a forfeiture of any kind, but merely a default judgment in an ordinary civil action between private parties brought under the RICO statute's private enforcement provisions. *See* 18 U.S.C. § 1964(c).

**31.** *See, e.g., United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1158 (2d Cir.1986).

**32.** The substitute assets provision was originally included in the 1984 bill, but was then deleted without explanation, Pub.L. No. 98–473, § 2301(e), 98 Stat. 2192, 2193 (1984), and not enacted until 1986. Pub.L. No. 99–570, § 1153(b), 100 Stat. 3207–13 (1986). The Senate Report on the 1984 bill explained that:

This provision is new to the law. It provides that where property found to be subject to forfeiture is no longer available at the time of conviction, the court is authorized to order the defendant to forfeit substitute assets of equivalent value. This subsection addresses one of the most serious impediments to significant criminal forfeitures. Presently, a defendant may succeed in avoiding the forfeiture sanction simply by transferring his assets to another, placing them beyond the jurisdiction of the court, or taking other actions to render his forfeitable property unavailable at the time of conviction.

S.Rep. No. 98–225, 98th Cong., 2d Sess. 201 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3384. Though this passage discusses the identical substitute assets amendment added to the criminal forfeiture section of RICO, 18 U.S.C. § 1963(m), the report indicates that the discus-

sion applies equally to § 853(p). S.Rep. No. 98–225, at 212, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3395.

**33.** It must be carefully noted that this opinion concludes solely that § 853 does not rely on money's fungibility. This is not to say that money does not have a distinctive fungible quality, or that money is not treated uniquely, for that reason, in other contexts. For example, this circuit has recently recognized the fungible nature of money in *United States v. Moore,* 27 F.3d 969, 976–77 (4th Cir.1994). There, defendant purchased condominiums with a combination of legitimate and fraudulently obtained funds, and later sold the condominiums, obtaining a check for $37,000 at settlement. Defendant was convicted of engaging in a monetary transaction— depositing the $37,000 check in a federally insured bank—with property, of a value greater than $10,000, derived from bank fraud. 18 U.S.C. § 1957. The court held that it could be presumed under § 1957 "that the transacted funds, at least up to the full amount originally derived from crime, were the proceeds of the criminal activity or derived from that activity." *Id.* at 977.

**34.** The requisite elements of a conversion claim, or action in detinue, under Virginia law are "(1) plaintiff must have a property interest in the thing sought to be recovered; (2) the right to immediate possession; (3) the property is capable of identification; (4) the property must be of some value; and (5) defendant must have had possession at some time prior to the institution of the act." *York v. Jones,* 717 F.Supp. 421, 427 (E.D.Va.1989). The Supreme Court of Virginia has held that, in such an action, "[i]f the specific

that this Court has the authority to enter judgment against the Law Firm under a conversion theory by virtue of its power to take actions to "protect the interest of the United States in the property ordered forfeited." 21 U.S.C. § 853(g).[35] The government's argument asks § 853(g) to carry more weight than the statute can bear. Nothing in § 853(g) supports the notion that it can serve as a basis for the government to assert a state law claim for conversion. Rather, as its terms make clear, § 853(g)'s function is the more modest one of preserving forfeited property. Section 853(g) contains a list of specific actions, such as requiring bonds or appointing receivers, by which the court may protect property that is already forfeited under the other portions of § 853. This listing, by the *ejusdem generis* rule,[36] confirms that the provision is limited to preserving forfeited property. Nothing in the provision authorizes courts to expand the category of forfeit-

ed property beyond what the statute otherwise provides.

Prior decisions involving § 853(g) do not support the government's attempt to use this provision as a basis for asserting a state law conversion claim. While several courts have issued orders based on state law in the context of criminal forfeiture proceedings, those orders merely preserved forfeited property. *United States v. Stazola,* 893 F.2d 34, 39 (3d Cir.1990) (approving order of eviction, based on Pennsylvania law, of tenants in building subject to forfeiture in order to facilitate government's disposition of building); *Braxton v. United States,* 858 F.2d 650, 655 (11th Cir.1988) (approving order that defendant pay "mesne" rents under Florida law to government for reasonable rental value of farm occupied after forfeiture).[37] The cases do not suggest that § 853(g) empowers courts to do more than preserve forfeited property.[38]

---

property cannot be returned, judgment is rendered for its value." *Broad Street Auto Sales, Inc. v. Baxter,* 230 Va. 1, 334 S.E.2d 293, 294 (1985).

**35.** Section 853(g) provides that:
Upon entry of an order of forfeiture under this section, the court shall authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court shall deem proper. Following entry of an order declaring the property forfeited, the court may, upon application of the United States, enter such appropriate restraining orders or injunctions, require the execution of satisfactory performance bonds, appoint receivers, conservators, appraisers, accountants, or trustees, *or take any other action to protect the interest of the United States in the property ordered forfeited.* Any income accruing to or derived from property ordered forfeited under this section may be used to offset ordinary and necessary expenses to the property which are required by law, or which are necessary to protect the interests of the United States or third parties.
21 U.S.C. § 853(g) (emphasis added).

**36.** *See United States v. Parker,* 30 F.3d 542, 552–53 (4th Cir.1994) (holding that canon of *ejusdem generis* prevents counting blacktop as one of "three or more separate apparatus intended for the recreation of children (slides, swingsets, teeterboards, and so forth)" required by statute).

**37.** In one unpublished decision, a district court did rely on the RICO section equivalent to § 853(g) to order a third party to return forfeitable property of the defendant. *United States v. Delco Wire & Cable Co.,* Crim. Nos. 87–194–01, 87–194–02, 1991 WL 152937 (E.D.Pa. August 6,

1991). Another opinion in the *Delco* case is discussed above. *See supra* note 29. By this later stage of the *Delco* proceeding, the court had appointed a trustee to collect the defendant corporation's forfeited assets. The trustee determined that the corporation had a cause of action against the corporation's president, for conversion of corporate funds. The trustee, on behalf of the United States, stepped into Delco's shoes and asserted the conversion claim. The court issued a "turnover order" against the corporation's president for the amount converted.

The Law Firm's situation is unlike that presented in *Delco.* The government is here seeking forfeiture from the Law Firm, as well as Covington. In *Delco,* the defendant corporation was the only party in the case subject to potential forfeiture. The corporation's president was liable to Delco, not under § 1963(c) or § 853(c), but under Pennsylvania law, regardless of whether a RICO offense or forfeiture ever occurred. Naturally, the RICO provisions equivalent to § 853(a), (c), and (p) had no bearing on what the president had to pay. In contrast, the government here is not collecting money that the Law Firm owes to Covington, but is instead seeking forfeiture of property to which it has title under § 853(c)'s "relation back" doctrine. Section 853(a), (c), and (p) therefore define the scope of that forfeiture.

**38.** Because this Court does not have authority under § 853 to entertain a conversion claim in the context of this criminal forfeiture, it is unnecessary to decide whether the government could proceed against the Law Firm in a separate action on a conversion theory, or whether, as seems likely, the determination of title under

## VI

█ Finally, the government argues that § 853(c) at least requires the Law Firm to forfeit property that is connected or traceable to the property it received from Covington, the original $103,800. This final argument has merit; unlike the government's other arguments, this argument is firmly grounded in the statutory language.

As described above, § 853(c) expressly applies to "property described in subsection (a)" of § 853. Section 853(a), in turn, requires forfeiture of "property constituting, or derived from" criminal proceeds. Thus, § 853(c), by reference to § 853(a), applies not just to the criminal proceeds themselves but also to property derived from, *i.e.*, traceable to, such property. The hypothetical example already noted illustrates this point. The drug trafficker who accumulates cash by selling cocaine and purchases a Jaguar with the money must forfeit the car as it is property traceable to criminal proceeds. A third party, the drug trafficker's lawyer, who receives the Jaguar, could be required to forfeit the car, for the Jaguar is included within § 853(a) as property derived from drug proceeds, and § 853(c) allows forfeiture of property described in § 853(a). Similarly, under a slightly different sequence of events, if the drug trafficker had instead transferred his ill-gotten cash to the lawyer, and the lawyer used the money to purchase the Jaguar, the same result obtains. The car would be subject to forfeiture under § 853(c), for as before, the Jaguar would be property derived from proceeds of the criminal violation. Neither the defendant nor a third party can escape an impending forfeiture order by disposing of forfeitable funds in a transaction that leaves behind property derived from the dissipated funds.

The conclusion drawn from the statutory language, that § 853(c) reaches property derived from criminal proceeds, finds firm support in the fact that the provision would be perilously ineffective if it did not provide for forfeiture of traceable property. If § 853(c) did not reach traceable property in the hands of a third party, then in any case involving a transfer of cash, such as this one, the government would be limited to recovering the precise dollar bills that defendant passed to a third party. In this case, for example, the Law Firm would be free to immunize itself from forfeiture merely by taking the bills to the bank and trading them for fresh currency, or similarly, by depositing the money in its savings account.[39] If § 853(c) did not reach traceable property in the hands of transferees, forfeiture would be defeated as soon as the transferee caused the forfeited money to cross the bank teller's counter. This does not happen because § 853(c), by explicitly incorporating § 853(a)'s definition of forfeited property, reaches property traceable to criminal proceeds.

Not all forfeiture statutes need extend to traceable property. Yet, statutes providing for forfeiture of money must do so, if forfeiture orders are not to be easily circumvented by simply depositing the tainted funds in the nearest bank or commingling the cash with other money. Accordingly, in civil forfeiture statutes, Congress has generally provided expressly for the forfeiture of traceable property in provisions directed at criminal profits.[40] By contrast, Congress has generally declined to require forfeiture of traceable property

§ 853(c)'s "relation back" provision would be binding in such an action.

**39.** In the leading case on tracing of forfeited property, *United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986), the court, in discussing how the government may trace money deposited in bank accounts, stated that:

> The first context is the straight-forward situation where a seller of narcotics opens a bank account and deposits into the account only money received from drug sales. The deposited money has been exchanged for a credit. This credit is clearly "traceable proceeds" under the forfeiture statute.

*Id.* at 1158.

**40.** *See* 18 U.S.C. § 981(a)(1)(A)–(D), (F) (civil forfeiture of property traceable to proceeds from various federal offenses including money laundering, drug trafficking in violation of foreign laws, fraud, and auto theft); 18 U.S.C. § 2254(a)(1), (3) (civil forfeiture of property traceable to proceeds from child pornography); 21 U.S.C. § 881(a)(6) (civil forfeiture of property traceable to proceeds from drug trafficking). But Congress has not been completely consistent in including the term "traceable" in every appropriate statute. For a statute providing for forfeiture of money that does not mention traceable property, see 18 U.S.C. § 3681(a) (civil forfeiture by defendant, convicted of violent crime, of proceeds earned under contract relating to movie, book, or television program based on crime).

where the items forfeited are unique tangible property used in crime, such as chemicals, weapons, or vehicles.[41] This pattern of congressional action further supports the conclusion suggested by the plain language of § 853, namely that § 853(c) authorizes forfeiture of property that is traceable to criminal proceeds ordered to be forfeited.[42]

■ The question then becomes whether the Law Firm holds any property that is derived from the proceeds of Covington's drug trafficking activities. With the exception of $3,695 remaining in the escrow account, the Law Firm contends that it holds nothing derived from Covington's money. The Law Firm relies on the "intermediate balance rule," developed in the law of trusts and applied in some forfeiture cases, which provides that once tainted funds are withdrawn from an account, subsequent deposits of unrelated funds will not be treated as taking their place. *See United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986) (applying rule to forfeiture of bank accounts); *In re Columbia Gas Systems Inc.,* 997 F.2d 1039, 1063–64 (3d Cir.1993) (applying rule in bankruptcy context), *cert. denied,* — U.S. —, 114 S.Ct. 1050, 127 L.Ed.2d 372 (1994). The sensible principle described in *Banco Cafetero* has been endorsed in a number of subsequent forfeiture cases.[43] In this context, if money presently in an account were deemed traceable to money formerly withdrawn from the same account, when there is no other relation between the two sums of money, this would essentially amount to a rule that all money is fungible, a rule that § 853 cannot be read to contain. *See United States v. Moore,* 27 F.3d 969, 977 (4th Cir.1994) (describing the "accepted, but arbitrary, accounting techniques" of *Banco Cafetero).* Thus, under the lowest intermediate balance rule, with the exception of the escrowed $3,695, the Law Firm's bank accounts contained none of Covington's money after the accounts were emptied in January 1992, which was well before the issuance of the May 1992 restraining order.[44] The remainder of Covington's money, approximately $100,000, was withdrawn from the Law Firm's accounts between August 1991 and January 1992. The government might seek to determine the whereabouts of the withdrawn funds, to identify any property derived from those funds, and to obtain forfeiture of that property. The government has not indicated whether it believes the Law Firm possesses such property traceable to the withdrawn amounts. As the parties have not yet fully addressed this issue, they will now have the opportunity to do so.

## VII

In summary, the following principles emerge from the analysis of § 853 and the decided cases:

---

**41.** *See* 16 U.S.C. §§ 403h–4, 773h(a), 1437(d)(1), 3374, 3606(c), 5010 (civil forfeiture of vessels and gear used, and resources taken, in violation of environmental laws); 17 U.S.C. § 509(a) (civil forfeiture of materials used in copyright infringement); 18 U.S.C. § 492 (civil forfeiture of counterfeit paraphernalia); 18 U.S.C. § 2254(a)(1)–(2) (civil forfeiture of child pornography and related equipment); 19 U.S.C. § 1609(a) (civil forfeiture of vessels, merchandise, and baggage in violation of customs laws); 21 U.S.C. § 881(a)(1)–(5) (civil forfeiture of drugs and related raw materials, containers, conveyances, and records); 26 U.S.C. § 7302 (civil forfeiture of materials intended for use in violating internal revenue laws); 30 U.S.C. § 1466(a) (civil forfeiture of vessels, cargo, and minerals taken in violation of deep seabed mineral resource laws).

**42.** The Law Firm also argues that tracing is inapplicable here because the concept is known only in *in rem* forfeiture, and § 853 is a criminal forfeiture statute. In making this argument, the Law Firm is taking inconsistent positions, as it previously argued the opposite in connection with the fungibility of money argument. In that context, the Law Firm strenuously argued that money is not fungible under § 853(c) because a forfeiture is not *in personam* as to third party transferees. The Law Firm cannot have this both ways, and in any event, this argument cannot override the terms of § 853(c), which plainly incorporate traceability from § 853(a).

**43.** *See United States v. All Funds Presently on Deposit or Attempted to Be Deposited in Any Accounts Maintained at American Express Bank,* 832 F.Supp. 542, 551–52 (E.D.N.Y.1993); *United States v. All Funds on Deposit in Great Eastern Bank Account Number 11008117 in the Name of Hadson Toko Trading Co.,* 804 F.Supp. 444, 446 & n. 3 (E.D.N.Y.1992); *United States v. Eighty-Eight (88) Designated Accounts Containing Monies Traceable to Exchanges for Controlled Substances,* 786 F.Supp. 1578 (S.D.Fla.1992).

**44.** The Law Firm has conceded that the $3,695 remaining in the escrow account constitutes property derived from Covington's drug money.

■ (1) The government's forfeiture power against a defendant is extensive. It extends not just to the proceeds of criminal activity, but to all property traceable to such proceeds. Beyond this, it extends even to substitute property, that is, to any of a defendant's property in the event that the actual criminal proceeds or other traceable property have been transferred, consumed, expended, or otherwise disposed of by defendant.

■ (2) The government's forfeiture power against a third party transferee is significantly less extensive. It extends only to the actual criminal proceeds or any property traceable to such proceeds, and this is so only if the transferee cannot carry the burden of showing that she has a superior interest in the property or is a bona fide purchaser who, at the time of the transfer, was reasonably without cause to believe that the property was subject to forfeiture.

■ (3) The government's forfeiture power against a third party transferee does not extend to substitute property. Thus, where, as here, a transferee dissipates or disposes of the criminal proceeds prior to the issuance of the forfeiture order, the government cannot compel the transferee to forfeit substitute property.

(4) The nature of cash as a fungible commodity does not alter principles (1) through (3) above.

■ (5) Section 853(g) permits courts to take limited action to preserve the government's interest in property already forfeited, but it does not permit the government to pursue a state law claim for conversion to accomplish or achieve a forfeiture.

■ (6) From (1) through (5), it follows that where, as here, a third party transferee fails under § 853(n) to qualify as a bona fide purchaser reasonably without cause to know of the potential forfeiture, the government can reach only the criminal proceeds themselves, if they are still in the third party's possession, or any of the party's property that may be traceable to the criminal proceeds. Thus, because the Law Firm in this case has already spent the bulk of the actual criminal proceeds, the government is limited to whatever remains, apparently the $3,695 and any other Law Firm property traceable to the criminal proceeds.[45]

Some may lament this result, noting that § 853(c) is, at least in some situations,[46] a weak tool for divesting third parties of property received from criminal defendants.[47]

**45.** The Law Firm also contends that the equities in this case weigh in its favor, and that the government's delay in initiating the forfeiture should bear against recovery of property from the Law Firm. This is not a discretionary matter; it is a matter of what the forfeiture statute allows. To the extent that equitable considerations might play a role, they would not weigh against the government. As indicated in the factual account at the outset of this opinion, the government's failure to obtain a restraining order before May 1992 was largely due to the fact that the Law Firm did not disclose its transactions with Covington.

**46.** It is worth noting that once a restraining order or forfeiture order has been entered, the statute effectively prevents the defendant or a third party from dissipating criminal proceeds. In its chief decisions regarding criminal forfeiture and attorneys' fees, the Supreme Court considered whether defendants could transfer forfeitable assets to attorneys *after* the entry of restraining orders pursuant to § 853(e). *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 620, 109 S.Ct. 2646, 2649, 105 L.Ed.2d 528 (1989) (defendant paid attorney $25,000 in viola-

tion of restraining order); *United States v. Monsanto*, 491 U.S. 600, 604, 109 S.Ct. 2657, 2661, 105 L.Ed.2d 512 (1989) (defendant moved to vacate restraining order to permit use of frozen assets to retain attorney). Where an attorney accepts payment in violation of such a restraining order, the government can recover regardless of the fact that the attorney has dissipated the funds.

**47.** In its previous opinion in this matter, this Court recognized that attorneys "have a duty to make inquiries" when on notice that a client's funds may be subject to forfeiture. *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F.Supp. 463, 477 (E.D.Va.1994), *appeal dismissed*, No. 94–5167 (4th Cir. June 28, 1994). The conclusions reached in the present opinion reveal an avenue around the attorney's duty. Under § 853 as presently enacted, an attorney can accept fees from a client, money that the attorney overwhelmingly suspects was earned in drug trading, but avoid any forfeiture, by simply ensuring that the fees are promptly spent. As long as this remains possible under the statute, the attorney's duty to investigate the source of fees is significantly undercut.

But Congress did not enact § 853(c) in order to divest third parties of property, but did so instead as a backstop to § 853(a), to ensure that the defendant could not escape his punishment. The legislative history of § 853(c) explains that Congress enacted § 853(c) in direct response to its concern that the criminal forfeiture statues "fail adequately to address the phenomenon of defendants defeating forfeiture by removing, transferring, or concealing their assets prior to conviction." S.Rep. No. 98–225, 98th Cong., 2d Sess. 195, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3378. The Senate Report repeatedly emphasizes that § 853(c) is a measure "setting out clear authority for voiding improper pre-conviction transfers of assets" in order "to assure that [the defendant] cannot as a result avoid the economic impact of forfeiture." *Id.* at 196–97.[48] Thus, the purpose of § 853 has never been to punish third parties, even those who accept assets from the defendant with cause to believe they are subject to forfeiture. As recently as 1984, in fact, the statute had no application whatsoever to third parties. Congress could have created a more comprehensive scheme for penalizing those who do business with drug dealers simply by making § 853(p) applicable to third parties transfer-

ees. And, while the Supreme Court has recognized that "there is a strong governmental interest in obtaining full recovery of all forfeitable assets." *Caplin & Drysdale, Chartered, v. United States,* 491 U.S. 617, 631, 109 S.Ct. 2646, 2655, 105 L.Ed.2d 528 (1989), this is beside the point, because "[t]he short answer is that Congress did not write the statute that way." *United States v. Monsanto,* 491 U.S. 600, 611, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989) (quoting *United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081–82, 60 L.Ed.2d 624 (1979)). Of course, Congress may remedy this whenever it sees fit to do so.[49]

An appropriate order shall issue.

---

**48.** The Senate Report repeatedly states the purpose of § 853(c):

> [Section 853(c)] is a codification of the "taint" theory which has long been recognized in forfeiture cases. Under this theory, forfeiture relates back to the time of the acts which give rise to the forfeiture. The interest of the United States in the property is to vest at that time, and is not necessarily extinguished simply because the defendant subsequently transfers his interest to another. Absent application of this principle a *defendant could attempt to avoid criminal forfeiture* by transferring his property to another person prior to conviction.
> The purpose of this provision is to permit the voiding of certain pre-conviction transfers and so close a potential loophole in current law whereby *the criminal forfeiture sanction could be avoided* by transfers that were not "arms' length" transactions....
> Under this provision, the jury could render a special verdict of forfeiture with respect to property used or acquired by the defendant in · a manner rendering it subject to forfeiture, irrespective of the fact that it may have been transferred to a third party subsequent to the acts of the defendant giving rise to the forfei-

ture. Resolution of claims of third parties asserting that they are innocent *bona fide* purchasers, claims that will determine whether a transfer is ultimately voided, may be reserved for the post-trial ancillary hearing. This procedure provides for more orderly consideration both of the forfeiture issue and the legitimacy of third party claims. Moreover, even if a transfer is sustained at the ancillary hearing, the fact that the jury will have determined that the property would have been forfeitable if it had remained in the hands of the defendant will allow the court to order the forfeiture of substitute assets of the defendant as provided in [§ 853(p)], *to assure that the defendant does not retain the gain received from his pre-conviction transfer.*
S.Rep. No. 98–225, at 200–01, 1984 U.S.C.C.A.N. 3383, 3384. (footnotes omitted) (emphasis added).

**49.** This opinion determines solely the extent to which the Law Firm is subject to forfeiture under 21 U.S.C. § 853, taking no position as to whether the government might have another remedy, whether by a conversion action under state law, or under a different theory.