In re MOFFITT, ZWERLING & KEMLER, P.C.

Misc. No. 93–0006–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 19, 1995.

Helen F. Fahey, U.S. Atty., Jay Apperson, Gordon D. Kromberg, Asst. U.S. Attys., Alexandria, VA, for Government.

William B. Moffitt, John K. Zwerling, Lisa B. Kemler, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, Arthur F. Mathews, Craig M. Blackwell, Wilmer, Cutler & Pickering, Washington, DC, for Law Firm.

## MEMORANDUM OPINION

ELLIS, District Judge.

Like rumors of Mark Twain's death, statements that the last chapter in this saga had

been written were (lamentably) premature. Statements of this sort appeared in *In re Moffitt, Zwerling & Kemler, P.C.*, 864 F.Supp. 527 (E.D.Va.1994) (hereinafter *Moffitt II*),[1] which held, *inter alia*, that 21 U.S.C. § 853 requires a party who received forfeitable property from a criminal defendant, but who then transferred or dissipated the property prior to the entry of a restraining or forfeiture order, to forfeit property traceable to the transferred property. *Id.* at 541–42. The present chapter in this saga concerns disputes arising from the government's application for certain discovery orders in furtherance of its attempts to trace forfeitable property. Whether this is the final chapter remains to be seen.

## I.[2]

In August 1991, William Covington was under investigation for drug trafficking, and sought to retain the Law Firm to represent him. The Law Firm informed Covington that it would require an initial payment of fees in the amount of $100,000. Covington was able to assemble $103,800 in cash by disinterring money he had buried to avoid its forfeiture, and by collecting on debts owed him by his drug customers. On August 23 and 24, Covington delivered the cash to the Law Firm, and the money was promptly deposited into two bank accounts. The bulk of the money, $93,800, went into the Law Firm's general operating account, the account used for ordinary business needs such as paying rent, bills, and salaries. The remaining $10,000 was deposited in the Law Firm's "omnibus" escrow account to be held on Covington's behalf and used to defray the expenses of his representation. Although

this account contained funds of many different clients, the Law Firm kept separate ledgers of the amounts deposited and withdrawn for each client.

The Law Firm's bank accounts were quite active. In the months following the deposits of the $103,800, a substantial number of checks were written on the operating account, including several large ones.[3] For example, on September 13, 1991, the Law Firm withdrew $50,000 to open a savings account. On September 25, the Law Firm paid out $25,000 from the savings account as a loan to one of its partners, to be repaid with interest over several years, primarily through salary deductions. In January 1992, the remainder of the money in the savings account was withdrawn and redeposited in the operating account. Most importantly, in January 1992 and again in April of that year, the general operating account "zeroed out," that is, it temporarily reached a zero or slightly negative balance. Over the same period of time, Covington's $10,000 in the escrow account was gradually spent as the Law Firm withdrew money to cover the expenses of the representation. By May 1992, although the omnibus escrow account contained substantial sums of money belonging to other clients, Covington's ledger showed only $3,695 of the original $10,000 remaining.

The government's investigation of Covington continued while the Law Firm was spending the funds received from him. It culminated in an indictment on October 30, 1991 for drug distribution and money laundering. Although the indictment contained no specific reference to the funds Covington

1. The issues decided in *Moffitt II* arose as a result of the earlier decision that (i) the $103,800 in cash the Law Firm received from its client, William Covington, constituted proceeds from drug trafficking activities, and (ii) the evidence did not establish that the Law Firm was reasonably without cause to believe the cash was subject to forfeiture. *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F.Supp. 463 (E.D.Va.1994), *appeal dismissed*, No. 94–5167 (4th Cir. June 28, 1994) (hereinafter *Moffitt I*). This decision had the effect of leaving in place a February 1993 forfeiture order covering the $103,800.

2. The history of this proceeding and a more detailed statement of facts appear in *Moffitt I*

and *Moffitt II*. Only those facts necessary for context and the resolution of the questions presented are set forth here.

3. For example, in a representative week, November 1 to November 7, 1991, the Law Firm made 21 withdrawals from, and 12 deposits to, its operating account. The withdrawals were used for various purposes including rent, answering services, long-distance telephone service, express mail, bookkeeping services, parking fees, group health insurance premiums, gas, electricity, federal and state tax withholding, medicare and FICA payments, and miscellaneous office expenses. The deposits constituted rent, client fees, and client reimbursements.

paid the Law Firm, it did include a forfeiture count broadly covering all property derived from Covington's criminal activities. It appears that the government first received information in November 1991 about the August fee payments made by Covington. Although the government was able eventually to confirm that the Law Firm had deposited $103,800 in cash in its accounts in late August 1991, there was no conclusive evidence that this money had come from Covington. After unsuccessfully attempting to obtain such evidence, the United States Attorney for the Eastern District of Virginia, in March 1992, requested authorization from the Department of Justice to seek forfeiture of $103,800 from the Law Firm. On May 12, 1992, the Department of Justice approved the request, and the government then promptly filed a bill of particulars stating that the money was subject to forfeiture pursuant to Covington's indictment. The next day, the government moved for and received a restraining order enjoining the Law Firm and its partners, William B. Moffitt, John Zwerling, and Lisa Kemler, from expending Covington's $103,800 "or any property traceable to such property."

Covington eventually pled guilty to (i) a drug conspiracy in violation of 21 U.S.C. § 846, (ii) money laundering in violation of 18 U.S.C. § 1956, and (iii) a firearms offense in violation of 18 U.S.C. § 924(c). At sentencing on February 26, 1993, the Court ordered the forfeiture of virtually all of Covington's assets, including the $103,800 he paid to the Law Firm, contingent on the rights of any third parties to be claimed pursuant to 21 U.S.C. § 853(n). The Law Firm filed such a petition contending that the forfeiture was improper because the Law Firm was "rea-

sonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B). Following a full evidentiary hearing, the Court denied this petition.[4] The government then proposed a final decree of forfeiture of the $103,800, which the Law Firm opposed on the ground that, with the exception of $3,695 in the escrow account, it no longer had Covington's money. After further hearings, the Court held that the government's forfeiture powers under § 853 are less extensive with regard to forfeiture by third parties, such as the Law Firm, than with regard to criminal defendants, such as Covington. More specifically, the Court ruled that § 853 does not require the Law Firm to forfeit unrelated substitute property in place of the money received from Covington that was spent prior to the entry of the restraining or forfeiture order, but it does require the Law Firm to forfeit any property, held at the time such an order entered, that is derived from or traceable to Covington's money.[5]

The government is now pursuing forfeiture of traceable property from the Law Firm. On October 21, 1994, in furtherance of this effort, the government applied for an order of discovery pursuant to § 853(m).[6] By order dated November 7, the Court granted in part the government's motion for a discovery order, requiring the Law Firm to produce documents and other materials reflecting all payments from the firm's accounts in which Covington's money had been placed.[7] In response to the order, the Law Firm provided the government with bank statements of its operating and savings accounts and copies of its general ledger for the period from August 1991 to January 1992. On November 10 and 11, the government submitted eighteen addi-

4. *See Moffitt I.*

5. *See Moffitt II.*

6. Section § 853(m) provides that:

 In order to facilitate the identification and location of property declared forfeited and to facilitate the disposition of petitions for remission or mitigation of forfeiture, after the entry of an order declaring property forfeited to the United States, the court may, upon application of the United States, order that the testimony of any witness relating to the property forfeited

 be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged be produced at the same time and place, in the same manner as provided for the taking of depositions under Rule 15 of the Federal Rules of Criminal Procedure.

7. On the Law Firm's motion, the Court authorized the Law Firm to redact the names of payees other than Law Firm partners, but allowed the government leave to seek to compel disclosure of particular payees' identities upon a showing of good cause.

tional requests for information to the Law Firm. The Law Firm responded by letter, providing some, but not all, of the requested information. At a hearing on November 15, the government unsuccessfully sought permission to obtain documents directly from the Law Firm's bank, and the parties also presented argument on a variety of unresolved discovery disputes. The Court heard further argument and received additional briefs from the parties regarding those disputes, and the disputes are now ripe for disposition.

## II.

■ While the parties agree on very little, there seems to be common ground as to one important principle: courts are vested with considerable discretion with respect to the execution of forfeiture orders. Thus, following entry of a forfeiture order, courts may order the deposition of witnesses and production of documents "[i]n order to facilitate the identification and location of property declared forfeited." 21 U.S.C. § 853(m). And in this connection, the statute expressly instructs that execution of forfeiture orders shall occur "upon such terms and conditions as the court shall deem proper." 21 U.S.C. § 853(g).[8] Apart from this important, but narrow area of agreement, the parties dispute a variety of discovery issues arising from the government's efforts to trace the forfeited funds. Most fundamentally, the parties are at odds about the proper scope of tracing under § 853.

The Law Firm takes a very restrictive view of the government's § 853 forfeiture power. Noting that the statute's purpose is to punish criminals, the Law Firm argues that § 853(c) should not require a third party to forfeit property unless the forfeiture somehow punishes the defendant as well as the third party. The Law Firm thus contends that third-party forfeiture is appropriate where, for example, property was received in sham or fraudulent transactions.[9] But, the Law Firm argues, § 853(c) forfeiture is improper when it constitutes punishment only of the third party and not the criminal. Since the Law Firm believes forfeiture by it will not punish Covington in any manner, it submits that it should be required to forfeit only the $3,695 remaining in the escrow account, and no other property regardless of its traceability to Covington's money.

■ This restrictive interpretation of § 853 is unpersuasive.[10] It must be noted that the Law Firm's argument is not uniquely applicable to forfeiture of traceable property. Had the Law Firm placed Covington's $103,800 in a safe and never disturbed it, the Law Firm could still argue now that forfeiture of the money would punish it and not Covington. Thus, the Law Firm's argument, if accepted, proves too much; it justifies narrowly limiting all § 853(c) forfeitures, a result at odds with the terms and purpose of the statute. *See Moffitt II*, 864 F.Supp. at 544. The statute's words are the best indica-

---

8. The phrase "terms and conditions" has been found to confer discretion on courts in other contexts. *See* Rule 16(d)(2), Fed.R.Crim.P. (where party fails to comply with discovery rules, court may order discovery or exclude evidence upon such "terms and conditions as are just"), *discussed in United States v. Glover*, 846 F.2d 339, 342 (6th Cir.) (decision whether to impose sanctions for violation of discovery rules is "left to the sound discretion of the trial court"), *cert. denied*, 488 U.S. 982, 109 S.Ct. 533, 102 L.Ed.2d 565 (1988); 28 U.S.C. § 2001(a) (judicial sale of realty shall be upon such "terms and conditions as are just"), *discussed in United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir.) (courts' discretion in fashioning sales will not be disturbed on appeal absent abuse), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2034, 20 L.Ed.2d 878 (1968).

9. The Law Firm contends that limiting third-party forfeiture to sham and fraudulent transfers is proper because, in those instances, the property in the third party's hands "is *really* the property of the defendant." In fact, once the forfeiture order enters, the property is *really* the property of the government. *See* 21 U.S.C. § 853(c); *United States v. 92 Buena Vista Avenue*, —— U.S. ——, 113 S.Ct. 1126, 122 L.Ed.2d 469 (1993).

10. The Law Firm's argument has already been rejected by the Fourth Circuit. *See In re Caplin & Drysdale*, 837 F.2d 637, 641–42 (4th Cir.1988) (en banc) (finding forfeiture by attorneys under § 853 is not limited to sham transactions), *aff'd sub nom. Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

tion of what Congress intended.[11] While legislative history suggests that Congress was concerned in part about sham or fraudulent transfers of criminal proceeds,[12] Congress included no language even arguably restricting § 853(c) to such transfers. Moreover, Congress chose to include an exception for certain bona fide purchasers. *See* 21 U.S.C. § 853(c), (n). To read into the statute a different and even broader exemption would amount to legislation by judicial fiat.

The Law Firm's argument also takes an inappropriately myopic view of the statute's purposes. An attorney's forfeiture of fees, viewed in isolation and after the fact, always appears to punish the attorney and not the criminal. But this ignores the fact that effective third-party forfeiture laws encourage attorneys to act responsibly in accepting fees in the first place. When attorneys do so, criminals are deprived of the ability to hire legal talent with ill-gotten funds. *See In re Caplin & Drysdale,* 837 F.2d 637, 649 (4th Cir.1988) (en banc) (describing public interest in stripping criminals of undeserved economic power, including ability to hire expensive lawyers), *aff'd sub nom. Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989).

■ The government's view of tracing under § 853 is quite different. It properly notes that the statute provides for forfeiture of traceable property held by third parties such as the Law Firm,[13] and further authorizes discovery directed at identifying such property.[14] Given this, the government argues that it is entitled to pursue whatever discovery may be necessary to trace forfeited assets. In the government's view, failure to allow thorough discovery in the search for traceable assets would run counter to the criminal forfeiture statutes' purpose of stripping criminal offenders and organizations of

their ill-gotten economic power. *See* S.Rep. No. 98–225, 98th Cong., 2d Sess. 191 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3374; *Caplin & Drysdale,* 837 F.2d at 648. Although essentially sound, the government's position has important limits. The government's tracing and ancillary discovery efforts may not go wholly unbridled. They are subject to the exercise of sound judicial discretion.

## III.

Before addressing the parties' particular tracing disputes, it is helpful to set forth certain general principles applicable to tracing. As the parties have found, tracing is an area in which it is difficult to navigate by precedents, for in most respects, this case raises issues not previously addressed in the case law. We are, as it were, in largely uncharted waters.

■ Cases addressing tracing deal almost exclusively with one topic, namely the problem of tracing money through bank accounts in which tainted and innocent funds commingle. The leading case on tracing, *United States v. Banco Cafetero Panama,* 797 F.2d 1154 (2d Cir.1986), establishes three important principles. The first is that, while the government bears the burden of proving forfeitability by a preponderance of the evidence,[15] Congress did not saddle the government with all "the risk of the inevitable uncertainty that will arise in most [tracing] cases." *Id.* at 1160. Thus, when tracing commingled funds, the government is accorded flexibility to choose among various accounting approaches. Where tainted and innocent funds commingle in an account and withdrawals are made, the government might persuasively argue that (i) the tainted money remains in the account, (ii) that the tainted money came out in one or more withdrawals,

---

**11.** *See Amoco Production Co. v. Gambell,* 480 U.S. 531, 552, 107 S.Ct. 1396, 1407, 94 L.Ed.2d 542 (1987) (interpreting word "Alaska" in 16 U.S.C. § 3120 according to its familiar and precise "geographic/political meaning").

**12.** *See* S.Rep. No. 98–225, 98th Cong., 2d Sess. 209 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3392.

**13.** *See* 21 U.S.C. § 853(a), (c); *Moffitt II,* 864 F.Supp. at 541–42.

**14.** 21 U.S.C. § 853(m).

**15.** 21 U.S.C. § 853(a), (c), (d); *see United States v. Elgersman,* 971 F.2d 690, 694–97 (11th Cir. 1992); *United States v. Simone,* 931 F.2d 1186, 1198–99 (7th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 584, 116 L.Ed.2d 609 (1991).

or (iii) that the tainted money is both in the account's remaining balance and in the withdrawals, in pro rata amounts. *Id.* at 1159–60.

The second principle evident in *Banco Cafetero* is that realism and substance must control the definition of traceable property. The government's choices among accounting alternatives need not be blindly accepted by courts, for "[w]hich approach reflects reality in any particular case will depend on the precise circumstances." *Id.* at 1160. For example, if $175 from an automobile insurer is deposited in a bank account one day, and a $175 check to the garage is written the next, the government cannot convincingly argue that the insurance money is still in the account. *Id.*

■ The third principle described in *Banco Cafetero* is known as the "lowest intermediate balance" rule. It provides that once tainted funds are withdrawn from an account, subsequent deposits of unrelated funds will not be treated as taking their place. 797 F.2d at 1159. For example, if $100 of drug money is deposited into an account, and the balance fluctuates as low as $25, but deposits of unrelated funds bring the balance up to $200 at the time of the forfeiture order, only $25 from the account is forfeited. On the other hand, if the deposits made after the account first "zeroes out" are not unrelated, that is, if the deposits constitute criminal profits or traceable money, the lowest intermediate balance rule of course does not prevent their forfeiture.

*Banco Cafetero*'s principles may be, and indeed should be, extrapolated to issues other than commingled bank accounts. They should inform all tracing efforts. It would be inconsistent with Congress' purposes to immunize a party from forfeiture merely because its financial activities are complex. Thus, the government must be given some latitude in charting its way through a tangled web of financial transactions. But it is equally important that the government's tracing theories and accounting methods do not trump realism and common sense.[16] Often, the logic of tracing, if relentlessly pursued, can lead to a very lengthy, if not infinite, labyrinthically complex trail. Following such a trail is often neither sensible nor practical. There comes a time when two items of property, though logically connected by a long string of transactions, are too remote one from the other to justify forfeiture, and therefore cannot be termed traceable to or derived from one another.[17] In addition, overly rigid enforcement of arbitrary tracing rules invites avoidance, for if form dominates substance, persons with forfeitable property will soon learn the quickest way to launder their property of its traceable taint.

■ Judicial discretion must necessarily play a significant role in guiding and limiting governmental efforts to trace forfeitable assets. And the factors relevant to the exercise of judicial discretion vary from case to case. For example, the Law Firm complains that the government did not expeditiously pursue the forfeiture against it, and that much of the complications here arise from the fact that the government did not request its restraining order until May 1992. While the Court previously found that this delay was due in part to the Law Firm's failure to disclose Covington's identity, *see Moffitt II*, 864 F.Supp. at 543 n. 45, that does not mean that the government acted as promptly as it might have or that the government's delay is not an equitable factor to be considered in shaping tracing here. The contrary is true, as a moment's reflection confirms. Where the government fails to act promptly in seeking forfeiture, the resulting passage of time misleadingly encourages third-party transferees to believe that the property is not

---

16. *See United States v. Moore*, 27 F.3d 969, 977 (4th Cir.1994) (describing the "accepted, but arbitrary, accounting techniques" of *Banco Cafetero* ).

17. Analogously, in the context of tort law, courts long ago recognized that factual or "but for" causation, taken to its logical extreme, extends legal liability too far, for "[i]n a philosophical sense, the consequences of an act go forward to eternity." Keeton, et al., *Prosser & Keeton on the Law of Torts* 264 (5th ed. 1984). Thus, under the heading of "proximate" causation, courts set boundaries on tort liability according to "some social ideal of justice or policy." *Id.* Likewise, the concept of tracing reaches much further in logic than it should in practice.

subject to forfeiture and provides the opportunity for additional transfers, thereby further complicating and lengthening the tracing trail. Thus, where as here, the delay is due in part to the Law Firm's actions, but also in part to the government's procrastination, the latter factor may be weighed against the government's request to extend the tracing trail and to obtain discovery in aid of this effort.

■ Another factor that may weigh against the government here is its decision to remit Covington's forfeiture to some extent. Covington's plea agreement required the government to return to him certain hand tools and 50% of the net proceeds of the sale of certain equipment of his auto service business. The hand tools were mistakenly sold by the government along with the other equipment. The government realized $11,300 on the sale, minus expenses of $6,327 incurred by the United States Marshal's service, for a net recovery of $4,972. Accordingly, in April 1993, the government remitted half the balance, $2,486, to Covington. As the Law Firm argues, this remission must weigh in the Court's discretion in controlling the government's efforts to obtain forfeiture from the Law Firm. The fact that the government returned property of significant value to Covington militates against permitting the government to resort to intrusive discovery efforts against the Law Firm in pursuit of assets of lesser value than those remitted.

■ One must be careful to distinguish a voluntary remission by the government, such as the $2,486 here, from the government's settlement of claims against it, however wise or mistaken the settlement may be. The government released $5,500 of seized money to Covington that is in the latter category. Covington objected to the mistaken sale of his hand tools and the high ratio of the Marshal's expenses to the amounts realized on the sale. In March 1994, the government negotiated an agreement to settle all Covington's claims in return for release of an additional $5,500 of seized money.[18] The $5,500 is not relevant to the exercise of discretion in the proceeding against the Law Firm, since it represents not a willingness to forego forfeiture, but a settlement of claims against the government.[19]

■ It is also important to note that there can be no forfeiture of property from anyone, including Law Firm employees, who qualifies as a "bona fide purchaser for value ... who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(c). The Law Firm previously failed to qualify for this protection,[20] and based on that ruling, it appears beyond question that at least some of the Law Firm's partners would fail to qualify as well. The Law Firm argues that one of its three partners, Lisa Kemler, was a bona fide purchaser of Covington's money who was reasonably without cause to believe that it was subject to forfeiture. See 21 U.S.C. § 853(c), (n). On that basis, it contends further that Kemler should not be subject to discovery concerning whether she holds traceable property. The government responds that (i) whether Kemler qualifies for this protection is a question to be decided if and when the government proposes an order of forfeiture that includes

18. This amount was apparently transferred to Covington's former wife in satisfaction of back alimony obligations. It is not relevant here what Covington did with the money. The important fact is that the $5,500 was paid to Covington in settlement of his claims against the government, and not as a voluntary remission.

19. The Law Firm also complains that the government made inadequate efforts to locate other assets that it knew or should have known Covington possessed. It appears, though, that the government made reasonably substantial and sufficient efforts to find and forfeit Covington's ill-gotten property, and it should not be penalized now for its inability to defeat entirely the extensive efforts Covington undertook to conceal his assets from forfeiture.

20. The only conclusion about § 853's bona fide purchaser protection reached in this proceeding thus far is that the Law Firm itself could not prove that it was reasonably without cause to know the $103,800 was subject to forfeiture. See Moffitt I, 846 F.Supp. at 472–76. At the time Moffitt I was decided, the government's proposed final order of forfeiture sought $103,800 from the Law Firm, and nothing from its partners. Thus, only the Law Firm filed a § 853(n) petition asserting an interest in the property to be forfeited.

her property, and (ii) the possibility that she will later qualify under § 853(n) is irrelevant to the government's present discovery efforts. But where it appears likely that a person cannot be required to forfeit property because he or she qualifies for the protection of § 853(n), it surely is within a court's discretion under § 853(g) and (m) to curb discovery with respect to that person. The parties and the Court, in litigating and resolving the issues presented in *Moffitt I,* extensively considered what the Law Firm's partners knew or should have known when accepting Covington's money. Yet the government has presented no facts that suggest or show that Kemler had reason to know of the forfeitability of the $103,800. Under these circumstances, discovery with respect to Kemler's property is inappropriate. The same conclusion clearly applies to all parties other than the Law Firm and its other two partners.

 Several additional points are pertinent but require little discussion. First, in seeking forfeiture from the Law Firm, William Moffitt, and John Zwerling, the government must trace property only to May 12, 1992, the date the restraining order was entered against the Law Firm and its partners.[21] After that date, the Law Firm and its partners had no authority to dispose of money received from Covington or property traceable to it. They therefore cannot defend themselves against forfeiture by arguing that they dissipated forfeitable property after that date.[22] Second, property consumed prior to May 1992 cannot be forfeited. For example, money used by the Law Firm to purchase electricity, or to rent space or equipment, leaves no traceable property in the Law Firm's hands. This is in part a consequence of the nature of consumable assets, assets that are used up or cease to exist, either immediately or over a relatively

brief time. It is also a result in part of the fact that criminal forfeiture of substitute assets is available against a defendant, but not against a third party such as the Law Firm or its partners. *See* 21 U.S.C. § 853(p). It follows from this that the tracing trail is cut off when a third party uses forfeitable funds to purchase consumable assets. While a third party can legitimately frustrate forfeiture in this way, a defendant cannot do so because a defendant's substitute assets are subject to forfeiture.

## IV.

With these principles in mind, analysis may now focus on the particular tracing-related discovery issues raised in this case. The task here is not to decide what property is or will be forfeited, but rather to consider the merits of the government's tracing theories where necessary to resolve the discovery issues presented.

 ● **Operating account records after January 1992.** The Law Firm initially provided records of its operating account from August 1991 to January 1992, the month during which the account first zeroed out. It refused to provide later records on the theory that, under the lowest intermediate balance rule, money in the account after January 1992 is not traceable to Covington's money. *See Banco Cafetero,* 797 F.2d at 1159; *supra* page 1160. But as the government correctly points out, the rule merely provides that subsequent deposits of *unrelated* money are not traceable funds *merely* because they rest in an account that once held tainted funds. Subsequent deposits of tainted, traceable funds are of course a different matter. The government contends that some of Covington's money, after leaving the operating account prior to January 1992, re-entered the

---

21. Because Lisa Kemler was also subject to the May 1992 restraining order, she also cannot properly argue that she dissipated forfeitable property after the entry of the order. Yet, Kemler at present has no need for such an argument, since on the present record she appears to be a bona fide purchaser without reason to know of the possibility of forfeiture.

22. If the government demands forfeiture from a party (i) to whom the May 1992 restraining order does not apply, and (ii) by whom § 853's bona fide purchaser protection is not successfully raised, the government would be required to prove that the party possessed traceable property on February 26, 1993, the date of Covington's forfeiture order.

account after it zeroed out.[23] To this, the Law Firm responds that the operating account zeroed out again in April 1992. Thus, the money that re-entered the operating account was spent in some way between January and April. The government is entitled to attempt to trace this money out of the operating account, and to identify property derived from it. Accordingly, it appears that the Law Firm, appropriately, has now provided the government with records for the operating account for the period from January to May 1992.

**■ ● Payees' identities.** The Law Firm redacted the names of all payees, except its partners, from the copies of its general ledger it provided to the government. In place of the payees' names, the Law Firm substituted general descriptions of the payee or the expenditure, such as "landlord," "surety," "bank," or "furniture." The government contends that more information is necessary, and asks the Law Firm to provide it with the checks or at least more specific identification of the payees.

There is a delicate balance to be struck here. The government needs information to prepare its tracing case and to attempt to meet its burden of proving that the Law Firm possessed property derived from the fees Covington paid even after the fees were spent. Yet unlimited or uninhibited discovery may be unduly burdensome and unnecessarily intrusive, given the privacy interests of the Law Firm and its clients. The Law Firm has disclosed payments made to its partners. There is no evidence or suggestion in the record to date that other parties are subject to forfeiture. *See* 21 U.S.C. § 853(c), (n). Thus, there appears little reason for

further disclosure of payees' identities. The relevant issue is not to whom the Law Firm paid money, but rather, what the Law Firm received in return. Accordingly, the Law Firm must adequately describe the expenditures made from this account to allow the government to determine whether any traceable property remains in the Law Firm's hands.[24]

**■ ● Partners' salaries.** The government believes that salaries paid to the Law Firm's partners represented significant sums derived from the fees paid by Covington. Approximately fifty checks were written to partners between August 27, 1991 and January 28, 1992.[25] The government wishes to learn what happened to the checks, and in particular, whether the partners held property derived from the checks on May 12, 1992. The government's tracing argument here appears logically sound. The partners, arguably, were paid with funds derived from the tainted fees. The problem is one of balancing the government's discovery needs against the need to avoid untrammeled disclosure of the partners' personal financial affairs, and to avoid unnecessary expansion and protraction of this proceeding. If the funds were commingled in the partners' general accounts and devoted to meeting the partners' ordinary personal and family expenses, the funds must be deemed beyond the government's reach. To conclude otherwise would stretch the logic of tracing beyond the bounds of practicality and reasonableness. The government's argument that it should be allowed to trace the salary payments into any durable property purchased with these funds, such as the partners' televisions, books, and

**23.** This assertion appears accurate. The operating account first zeroed out on January 2, 1992. On January 8, $623.65 was transferred into the operating account from the savings account. And, throughout the period from January to April, the Law Firm received bi-weekly repayments, in the form of salary deductions, on a $25,000 loan made to one of its partners. Since this loan was arguably made with funds traceable to the tainted money, the government persuasively argues that the note and repayments pursuant to it are traceable property. *See infra* pp. 1164–1166.

**24.** In determining what information to disclose, the Law Firm should of course seek to redact

only the information necessary to protect its genuine confidentiality interests. Just as the Law Firm may not drag its feet solely to resist the government's tracing efforts, the government may not use the present case as an opportunity to embark on a fishing expedition in the Law Firm's files. The government's pursuit of information should be carefully tailored to reach only that information necessary to establishing its tracing case.

**25.** The government is likely to discover further salary payments between the date traceable funds "re-entered" the operating account and the date the account zeroed out again in April 1992. *See supra* note 23 and accompanying text.

clothes, may pass muster logically, but logic must give way here to a sense of proportion and reasonableness. On the other hand, if certain salary payments were held intact or used to purchase durable assets, whether tangible or intangible, of substantial value, then the government may have a persuasive claim for forfeiture of these amounts. Therefore, the Law Firm is directed to respond to the following interrogatories regarding those partners subject to forfeiture: [26]

1. Whether, between August 27, 1991 and April 8, 1992, any asset still in existence on May 12, 1992 was purchased by or on a partner's behalf for a price in excess of $1,000 [27] utilizing funds derived from the Law Firm's operating account or savings account.

2. Whether, between August 27, 1991 and April 8, 1992, periodic payments toward the purchase of property (including mortgage or loan payments) were made by or on a partner's behalf utilizing funds derived from the Law Firm's operating account or savings account, which payments total in excess of $1,000 over that period.

3. Whether, between August 27, 1991 and April 8, 1992, any money in excess of $1,000, derived from funds in the Law Firm's operating account or savings account, was transferred to an account or location where it remained intact on May 12, 1992.

4. Whether, between August 27, 1991 and April 8, 1992, money derived from the Law Firm's operating account or savings account was deposited in a bank account whose lowest intermediate balance [28] between the date of deposit and May 12, 1992 was greater than $1,000.

If the answers to these interrogatories are affirmative or require explanation, the Law Firm must provide information about the funds in question.[29]

■ The Law Firm contends that any money deposited in a joint bank account, such as that of a partner and spouse, cannot be deemed traceable. To the extent that some fraction of the money becomes property of a person without reason to know of the possibility of forfeiture, this is surely true. *See* 21 U.S.C. § 853(c), (n). But to the extent the money remains property of a person subject to forfeiture, traceability and forfeiture are not avoided simply by the fact that the money rests in a joint account. The Law Firm is thus directed to answer the interrogatories above with respect to joint accounts, although it remains to be determined whether all or part of those accounts is property of a party not subject to forfeiture.

■ ● **Moffitt's loan.**[30] On September 26, 1991, the Law Firm loaned $25,000 to one of its partners, William Moffitt, in return for which he gave the Firm a promissory note. Moffitt agreed to repay the loan with 8% annual interest by way of $361.57 deductions from his bi-weekly paychecks. As of December 1994, over $18,700 had been repaid. The $25,000 came out of the Law Firm's savings account, which was in turn funded with $50,000 from its operating account. These facts lead the government down two tracing paths.

■ First, the government persuasively argues that the promissory note (an account receivable of the Law Firm) as well as amounts already collected in repayment of

---

26. The Law Firm need not respond regarding salary payments to Lisa Kemler. *See supra* p. 1161–1162.

27. The $1,000 amount is admittedly an arbitrary figure, but it appropriately reflects the various competing considerations involved here, including the need to balance the government's discovery needs against the burdens and privacy intrusions imposed on the Law Firm and its partners, and the fact that the government voluntarily remitted a significant amount of forfeited property to Covington.

28. For purposes of this interrogatory, the lowest intermediate balance of an account is unaffected by the fact that it is a joint account.

29. By requiring the Law Firm to respond to these interrogatories, the Court expresses no opinion at present as to what property should be deemed to be traceable to the partners' salary payments and forfeited.

30. The government requested information as to whether additional loans were made to the Law Firm's partners. The Law Firm indicates that there were none.

the loan, are traceable property, because the $25,000 paid to Moffitt can be traced to drug trafficking proceeds received from Covington. An account receivable is clearly property that may be forfeited under § 853. *See* 21 U.S.C. § 853(b)(2) (defining "property" to include "intangible personal property, including rights, privileges, interests, claims, and securities"). Thus, the government is entitled to discovery of the loan's terms and repayment history. If the government establishes, as appears likely from the facts of record, that the account receivable was derived from the $103,800, all funds received in repayment of the loan may be subject to forfeiture. The government will be allowed to trace loan repayments made prior to the May 1992 restraining order to their whereabouts on that date. Since the Law Firm was bound by the restraining order not to dispose of property traceable to the tainted $103,800, which property included the loan repayments, the Law Firm will be obligated to forfeit an amount representing repayments made after May 1992. And, since the account receivable was forfeited to the government in February 1993, the Law Firm will forfeit that account receivable, that is, its right to the unpaid balance on the note. The government will step into the Law Firm's shoes and become entitled to collection of the note's unpaid balance.

It is irrelevant that Moffitt repaid the loan through salary deductions. Contrary to the Law Firm's assertions, the fact that Moffitt did not repay the loan in cash does not mean that no traceable property resulted from his repayments.[31] If the account receivable was derived from Covington's money, cash repayments would clearly be traceable to it. This conclusion cannot be altered by the fact that the Law Firm offset the repayments against Moffitt's salary. Here, as elsewhere, substance rather than form must control. But

for Moffitt's loan, each of Moffitt's paychecks would have been greater by $361.57, and the Law Firm's operating account would have been poorer by the same amount. The $361.57 that remained in the operating account every two weeks by virtue of Moffitt's loan is money derived from the account receivable. Thus, the government is entitled to discover the terms and schedule of Moffitt's loan and its repayment, which information the Law Firm has now apparently given the government.

Second, the government believes that the $25,000 loaned was traceable property in Moffitt's hands, and it is interested in the whereabouts of that money. In a document submitted under seal,[32] the Law Firm explained the personal use to which Moffitt put the $25,000, a use which is irrelevant here except to note that it appears to yield no traceable property. The government is not yet fully satisfied by the explanation given, either because it (i) doubts the credibility of the explanation, or (ii) believes that the $25,000 was commingled with other moneys while in Moffitt's hands prior its eventual disposition. The government is entitled to further discovery to reassure itself on each point. As to the latter point, it must be noted again that tracing of funds through bank accounts must reflect reality. For example, if Moffitt borrowed the $25,000 intending to make a substantial charitable contribution, deposited the money in his personal account, and a week thereafter wrote a $25,000 check to the United Way, the government could not persuasively contend, under a "last in, last out" accounting approach, that the tainted $25,000 was still in Moffitt's account. *See Banco Cafetero,* 797 F.2d at 1159. Under the hypothetical facts, the only realistic conclusion would be that the borrowed $25,000 was in the account for a week and then was paid out to the charity. *See id.* at 1160; *supra* p.

---

**31.** The Law Firm argues that Moffitt's repayments by salary deduction are functionally equivalent to the Law Firm simply foregoing a portion of Moffitt's debt each pay period. This is incorrect, for a loan is not the same as a gift, as any employee repaying debt through salary deductions will attest.

**32.** At the hearing of November 15, 1994, the Court accepted the document under seal, limit-

ing access to the United States Attorney for the Eastern District of Virginia and the two Assistant United States Attorneys handling this case. By order of December 8, 1994, the Court denied the government's motion to unseal the document, but modified the protective order to widen access to other officials within the federal government with whom the government's attorneys need to consult in this matter.

1159. On the other hand, if the actual circumstances were unlike this example, the government might be entitled to argue that Moffitt still has property traceable to the $25,000. The Law Firm, therefore, need only provide the government with records sufficient to explain the disposition of the borrowed funds.[33]

 ● **Routine business expenses.** From the current record, it appears that during the relevant period the Law Firm made frequent payments from its operating account for routine business expenses such as advertising, library materials, and office furniture, equipment, and supplies. The government seeks to discover more about such payments in order to determine what property the Law Firm may have purchased with the tainted money between August 1991 and May 1992. The Law Firm resists this discovery because it believes forfeiture of inexpensive assets such as books and telephones is not contemplated by the forfeiture statute. Accordingly, the Law Firm disclosed that the only "capital items"[34] it purchased during the relevant time period were four office chairs costing a total of $1400. The remainder of the business expenditures have been identified only generally as made to "computer supplier," "office supply company," "publisher," and so forth.

Section 853, on its face, applies broadly to property of any kind and value. *See* 21 U.S.C. § 853(b) (defining "property"). It cannot be construed to permit forfeiture only of Ferraris, Renoirs, and Armanis, and never desks, typewriters, and books. Nor does § 853 automatically exempt the Law Firm because it dissipated the tainted fees entirely in the ordinary course of business. Yet certain lines must be drawn in making the discretionary determination of how far tracing may stretch in a particular case, even though the lines drawn will inevitably appear somewhat arbitrary. In the circumstances of this case, forfeiture of items such as legal pads, office plants, and volumes from the shelves of the Law Firm's library is manifestly unwarranted. The Law Firm has identified the four office chairs as the most substantial durable assets purchased during the relevant time period. Whether the chairs are forfeited remains to be determined at the time the government completes its tracing effort and presents its final forfeiture claims. But further discovery and identification of less significant assets is inappropriate.

 The Law Firm also disclosed that, between August 1991 and May 1992, it made monthly lease payments on telephones and one photocopier.[35] After May 1992, the Law Firm purchased the photocopier pursuant to an option to purchase in the lease. In addition, the Law Firm made payments to a predecessor firm of one of its partners, John Zwerling, for use of another photocopier. The predecessor firm used these payments to repay a bank loan with which it purchased the photocopier. In general, rent payments leave no traceable property because a lessee purchases an intangible, impermanent property interest, that is, the right to use property for a specified time. When the time expires, the lessee has no remaining property interest and holds no property derived from the rent payments. Installment payments toward the purchase of property, including "rent-to-own" payments and purchase-money loan repayments, are a different matter. If the Law Firm's payments made between August 1991 and April 1992 contributed to its purchase of one or both of the copiers, then a portion of the copiers may be subject to forfeiture. The government is therefore entitled to discover the terms and nature of the payments made by the Law Firm with respect to the photocopiers.

 ● **Credit card bills.** Several checks were drawn on the Law Firm's operating account between August 1991 and January

---

33. In its most recent pleading in this matter, the government suggests that arrangements can be made with the recipient of the $25,000 for that money to be turned over to the Asset Forfeiture Fund, in which case Moffitt would become indebted to pay the recipient another $25,000. Because no discovery disputes arise from this theory, it is unnecessary to consider it here.

34. The Law Firm defines this term as "tangible property that may have a resale value."

35. This photocopier was originally leased by a predecessor firm of William Moffitt, one of the Law Firm's principals. The Law Firm assumed its lease after the two firms merged.

1992 to pay American Express and Optima credit card bills. The cards were used by the partners for both personal and business expenses. The Law Firm paid the entire bills, and the partners reimbursed the Firm for personal expenditures through paycheck deductions. The government seeks discovery of the credit card statements for which the checks were written in order to discern if the cards were used to purchase property traceable to the tainted fees.

The government's tracing theory here is logically sound. If the Law Firm or one of its partners held property on May 12, 1992 that was purchased, by credit card, with money derived from the tainted funds, that property may now be subject to forfeiture. Many credit card purchases, such as meals and hotel rooms, yield no traceable property because the item purchased is consumed. Moreover, purchases of durable property of insubstantial value also do not result in property that can be deemed traceable and forfeitable. Since some credit card purchases may yield traceable property, the government is entitled to information explaining the purchases made with money arguably derived from the tainted fees. The Law Firm has explained that, for the period from August 1991 to January 1992, the credit cards were not used for expenditures other than for non-reimbursable business or ordinary living expenses. Thus, it appears that no traceable property arose from the credit cards' use in that period. In any event, the Law Firm must provide the government with information regarding the credit cards' use from January to April 1992. Specifically, the Law Firm must indicate whether, between August 27, 1991 and April 8, 1992, any asset still in existence on May 12, 1992 was purchased with the credit cards for a price in excess of $1,000. If the answer to this interrogatory is affirmative or requires explanation, the Law Firm must provide further relevant information.

■ ● **Escrow account records.** The Law Firm placed $10,000 of the fees received from Covington in its "omnibus" escrow account, an account which contained money of other clients. Separate ledgers were kept for each client. Covington's ledger shows only $3695 of his $10,000 remaining. The Law Firm explains that the remainder was spent in representing Covington. The government contends that the escrow account, despite the fact that it contained many clients' funds, is one bank account for tracing purposes. The Law Firm placed $10,000 of Covington's money in the account, and the account has always contained more than $10,000. Relying on the "last in, last out" accounting method described in *Banco Cafetero*, 797 F.2d at 1159, the government argues that all $10,000 of Covington's money stayed in the escrow account and that $10,000 from the account is now subject to forfeiture.

The government's position is an unrealistic interpretation of the facts. First, the omnibus escrow account is not properly treated as one account if, in substance, it was not operated as one. Rather than opening a separate account for each of its clients, the Law Firm reasonably used one escrow account, but then maintained separate ledgers tracking the deposits and withdrawals for each client. In so doing, the Law Firm took care not to spend one client's money on another's representation. In substance, the Law Firm acted as though each client's money was in a separate escrow account. Moreover, even if the entire omnibus escrow account were appropriately treated as a single account for tracing purposes, the government's accounting theory ignores the reality here that $6,305 of the $10,000 was actually spent on Covington's representation. It is true that neatly matching tainted deposits with particular withdrawals is usually difficult, and hence the government should have some latitude in choosing among accounting methods. *See Banco Cafetero*, 797 F.2d at 1160; *supra* p. 1159. But here, though Covington's money was commingled with other clients' funds, the Law Firm treated each clients' money separately on its ledgers, and it is plainly possible to identify which withdrawals came from Covington's money. It is therefore inappropriate to ignore reality and to treat all $10,000 of Covington's money as remaining in the escrow account.

The conclusion that the majority of Covington's $10,000 was withdrawn from escrow may not end the matter if any of the $6,305

can be traced to forfeitable property. The Law Firm therefore must provide the government with information sufficient to enable the government to determine if traceable property arose from the withdrawals. To be sure, the government is limited in following the tracing trail by the general principles already set forth here, including the fact that the government remitted $2,486 of forfeited property and cannot pursue lesser amounts from the law firm now, and the fact that expenditures for many items (including travel, meals, filing fees, copying, postage, and telephone calls) do not yield traceable property. It appears that the Law Firm has now supplied the government with a copy of Covington's ledger sheet, with some information redacted. The government may need additional information to determine what traceable property arose from the withdrawals noted on the ledger. In responding, the Law Firm may redact information to the extent necessary to preserve confidentiality, keeping in mind that Covington has waived his attorney-client privilege with respect to all information in the Law Firm's possession.

● **Predecessor law firm's accounts.** The Law Firm's operating account records reveal that a number of payments were made to predecessor law firms of the Law Firm's partners. Several types of payments to predecessor firms have been identified.

First, the Law Firm made payments to a predecessor firm of John Zwerling in relation to a photocopier. The government's discovery efforts with respect to these payments is treated elsewhere in this opinion. Second, $15 was withdrawn automatically by the bank from the Law Firm's account as a service charge to maintain the account of Zwerling's predecessor firm. The bank that received the $15 is unquestionably a bona fide purchaser without reason to know of the possibility of forfeiture. *See* 21 U.S.C. § 853(c), (n). No further discovery is appropriate as to this *de minimus* amount. Third, on May 9, 1992, the Law Firm made a payment of $1,316 to Zwerling's predecessor firm, which amount represented the portion of a fee for work done by the predecessor firm on a case prior to the firms' merger. Since this payment was made after the Law Firm's operat-

ing account "zeroed out" a second time in April 1992, the $1,316 is clearly not subject to forfeiture.

Fourth, just prior to surrendering to the authorities on November 1, 1991, Covington gave $32.62 cash to the Law Firm. The money was inadvertently deposited in a trust account of William B. Moffitt and Associates (the "Associates account"), a predecessor firm of one of the Law Firm's principals. The Law Firm eventually noted the error and placed the $32.62 in its escrow account in Covington's name on October 26, 1992. In pursuing forfeiture of this money, the government requested account records for the Associates account from August 1991 to October 1992. The Law Firm declined to provide the records, on the ground that the amount involved is *de minimus*. While § 853 allows forfeiture of property of any value, great or small, subject to judicial discretion under § 853(g), discovery under § 853 is a different matter. It is certainly within courts' discretion to deny § 853(m) discovery requests that greatly overshadow the property at stake. In any event, further discovery is unnecessary here because the Law Firm effectively concedes the forfeiture of this money. The Law Firm explained that it received the $32.62 from Covington and deposited it in the Associates account, where it remained on May 12, 1992, the date of the restraining order compelling the Law Firm not to transfer or convey it. Yet the Law Firm admits it later transferred the money to its escrow account. Since grounds for forfeiture of the $32.62 are plainly present, the Law Firm need provide no further discovery with respect to the Associates account.

■ ● **Payments to entities partly owned by the Law Firm's partners.** The government requested information regarding any affiliation between the Law Firm's partners and its landlords, and learned that the Law Firm rented space from Calumnia Investment Group ("Calumnia"), a Virginia partnership in which one of the Law Firm's principals, John Zwerling, owns a 35% interest. Between August 1991 and January 1992, the Law Firm paid nearly $10,000 to Calumnia from its operating account. The

government presumes that Calumnia used this money to pay its mortgage on the rental property, and believes it is entitled to forfeiture of that property to the extent of Zwerling's fractional ownership interest.[36]

An example illustrates the limitations on such forfeiture. If the Law Firm had taken Covington's cash and immediately used it to purchase a new computer system from IBM for $103,800, the computers would be subject to forfeiture by the Law Firm,[37] but the government could not obtain forfeiture of $103,800 from IBM's bank account. IBM, of course, would be a bona fide purchaser of the money, without reasonable cause to know it is subject to forfeiture. *See* 21 U.S.C. § 853(c), (n). Would this result change if one of the Law Firm's partners was an IBM shareholder? Surely, the answer is "no." The money in IBM's account would not be forfeited, because despite the partner's role in the corporation, IBM would still qualify for § 853's innocent purchaser protection. And the partner's IBM stock would not be forfeited either, because it would not be traceable to the tainted money, there being no relation[38] between the $103,800 computer purchase and the partner's shares.[39]

Zwerling's part ownership of Calumnia is potentially distinguishable from this hypothetical example in several ways. First, the government might believe that Calumnia, unlike IBM in the example, was not reasonably unaware that the rents it received were subject to forfeiture. If so, the government could demand forfeiture by Calumnia, and the bona fide purchaser protection would not succeed as a defense. *See* 21 U.S.C. § 853(c), (n). While Zwerling likely had a greater role in Calumnia than he would as a shareholder of IBM, the government would still be hard pressed to offer evidence that Calumnia, as an entity, reasonably could have been aware that the rent checks it received were subject to forfeiture.[40] The current record facts do not establish a realistic possibility that the government could successfully obtain forfeiture of specific partnership property from Calumnia.

Second, the government might seek to compel Zwerling to forfeit his partnership interest in Calumnia. To do so, it must distinguish the IBM example by contending that the connection between Zwerling's partnership interest and the rents Calumnia received is much closer than the connection

---

**36.** Two forms of property are involved here, (i) Calumnia's specific partnership property, which includes the real property rented to the Law Firm, and (ii) Zwerling's partnership interest in Calumnia, his intangible ownership share of the partnership. *See* Va.Code §§ 50–24, 50–25. If Calumnia were to forfeit the former, the government would become the outright owner of a fractional interest in the rental property. *See* Va.Code § 50–25(B)(3) ("A partner's right in specific partnership property is not subject to attachment or execution except on a claim against the partnership."). If Zwerling were to forfeit the latter, the government would step into his shoes, becoming a partner in Calumnia entitled to Zwerling's share of profits and surplus. *See* Va.Code §§ 50–26, 50–28 (judgment creditor of partner may obtain charging order against partnership interest).

**37.** The Law Firm received nothing from Calumnia akin to the computers in the IBM example. In its dealings with Calumnia, the Law Firm purchased use of space, an intangible property right that cannot now be forfeited. *See supra* p. 1162.

**38.** No relation, that is, other than the extremely tenuous connection that all IBM's revenues incrementally benefit the value of its shares.

**39.** There is one additional type of property in the IBM example that might conceivably be forfeited, namely dividends paid by IBM. Calumnia paid no "dividends," that is, it made no distributions of partnership income to Zwerling or its other partners during the relevant time period.

**40.** The burden would of course be on Calumnia to prove by a preponderance of the evidence that it qualifies for § 853(c)'s innocent purchaser exception. *See* 21 U.S.C. § 853(n)(6). Calumnia would surely contend that it was wholly unaware of the possibility of forfeiture, and in refuting this, the government would receive little or no help from the notion that Zwerling's awareness is attributable to Calumnia under partnership law. In Virginia law, such attribution occurs when a partner has "notice" of a fact, meaning he receives oral or written notification of it, or "knowledge" of a fact, meaning he has actual knowledge of it or the circumstances demonstrate bad faith. *See* Va.Code §§ 50–3, 50–12. Although the Law Firm could not prove by a preponderance that it qualified for § 853's bona fide purchaser protection, there are no facts indicating Zwerling had actual notice or knowledge that the $103,800 was subject to forfeiture.

between Zwerling's hypothetical IBM stock and the Law Firm's imaginary computer purchase. If so, the government could argue, the rents are traceable to the mortgage payments, the mortgage payments are traceable to the mortgaged property, and the mortgaged property is traceable to Zwerling's partnership interest. Therefore, the theory goes, Zwerling must forfeit his interest in Calumnia, at least to the extent of his proportionate share of the approximately $10,-000 of rent payments. While there is surely some logical relation between Zwerling's partnership interest and the tainted rents,[41] it is too tenuous to justify the conclusion that the partnership interest is "derived from" the rents within § 853's meaning.

In sum, the Law Firm's rent payments did not produce traceable property to be forfeited. Because, on this record, it appears that (i) Calumnia is not subject to forfeiture, and (ii) Zwerling does not hold property that can be deemed traceable to the rent payments, further discovery regarding the Law Firm's rent payments to Calumnia is unnecessary.[42]

■ ● **Payments to entities owned by spouses of the Law Firm's partners.** The government also requested information about payments from the Law Firm's operating account to spouses and immediate family members of the partners. In response, the Law Firm disclosed that certain items described on the redacted ledger as "professional fees" were paid to a corporation solely owned by a partner's spouse. Specifically, these payments were to Patricia West, John Zwerling's wife, who performed bookkeeping services for the Law Firm beginning in August 1991. Any attempt to require West to forfeit property would likely be blocked by the assertion of § 853's bona fide purchaser protection. *See* 21 U.S.C. § 853(c), (n). There are no record facts refuting the conclusion that West was reasonably without cause to know her fees were subject to forfeiture. Alternatively, the government might wish to discern what West did with her fees,

in the hope that it could trace the fees through her to property in the hands of some entity, such as the Law Firm or her husband Zwerling, that would be forfeitable. The connection between Covington's money and such property would be attenuated at best, too attenuated to justify burdensome and intrusive discovery or to warrant a realistic conclusion that the property is "derived from" Covington's money within § 853's meaning. Thus, there is not a realistic possibility that further discovery regarding West's fees would yield traceable property. In addition, there is no evidence that West played a role in the Law Firm's acceptance of Covington's money, or had decision-making authority over the Law Firm's operations. Extra caution is warranted before infringing the privacy of, and imposing discovery burdens on, a person with no responsibility for the present proceeding. Further discovery with regard to West's fees is therefore inappropriate.

■ ● **Insurance.** The government also believes traceable property arose from several payments made by the Law Firm to insurance companies. In some circumstances, insurance may yield traceable property. For example, if a drug dealer uses his illicit profits to purchase auto insurance, and later wrecks his car and collects under the policy, the insurance money is derived from the insurance premiums. On the other hand, if the drug dealer buys the insurance, but drives safely and avoids accident, no benefits will be paid, and no property traceable to the insurance premiums arises.

In the present case, the Law Firm made several payments on insurance policies, but none of the policies had a cash value or paid benefits to the Law Firm. The only benefits paid under the insurance policies were either (a) paid directly to health-care providers for services rendered to employees of the Law Firm, or (b) paid to employees in reimbursement for medical expenses already paid by the employees. Neither type of payment

---

**41.** Specifically, Calumnia's revenues increase the value of its partnership shares, just as IBM's revenues increase the value of its stock. And, Calumnia being a smaller financial entity than IBM, the connection is less diluted.

**42.** In addition, the Law Firm attests that Calumnia has no equity in the property anyway, as demonstrated by the fact that the building is currently for sale at the price of the mortgage.

results in traceable property. The government clearly cannot obtain forfeiture of fees paid directly to health-care providers who had no reason to know of the prospective forfeiture. *See* 21 U.S.C. § 853(c), (n). Nor do Law Firm employees, even partners, reimbursed for their medical expenditures, now possess property "derived from" tainted insurance reimbursement payments. Where an employee pays a certain amount to a doctor for medical care, and an insurance company reimburses her soon after in the same amount, the insurance company has, in substance, paid the doctor. The fact that the insurance company did not pay the doctor or hospital directly in every instance does not alter the substance of the transactions. *See supra* p. 1159. For tracing purposes, the Law Firm's employees did not retain money derived from the tainted fees by virtue of the medical expense reimbursements, and therefore discovery regarding the Law Firm's insurance payments is unnecessary.

■ ● **Taxes.** The government also presents a novel tracing theory regarding payments made by the Law Firm to the IRS to satisfy its partners' income tax withholding obligations. The Law Firm made a number of such payments between August 1991 and January 1992, and the government believes that several of the Law Firm's partners received substantial tax refunds for the 1991 tax year. The government's theory is that the refunds derived, in part, from the withholding payments because the refunds constitute the return of money withheld in excess of the tax owed.[43]

If the government establishes that withholding payments were made with money derived from the $103,800 received from Covington, a portion of the resulting tax refunds might be deemed traceable property. It is important to note that the entire refund would not be traceable unless the partners' entire withholding for the year was derived from tainted money. The question, akin to tracing money through bank accounts, is one of matching deposits with withdrawals, that

is, matching the withholding paid to the IRS with the tax refunds. The accounting principles described in *Banco Cafetero* have not previously been applied in the context of tax returns, yet seems appropriate in this context as well. Under these principles, where some, but not all, of the withholding constituted traceable money, it would be unrealistic to treat all of the tainted money as going toward the tax refund rather than to taxes. For example, if an employer paid $200 of tax withholding, $50 of which derived from drug dealing, and the IRS paid the employee a $60 tax refund, the government may not properly treat the entire tainted $50 as flowing into the taxpayer's hands via the refund. The more realistic conclusion is that one-fourth of the withholding was tainted, and so one-fourth, or $15, of the refund was derived from the tainted withholding. *See Banco Cafetero,* 797 F.2d at 1159 (describing "averaging" or "pro rata" accounting approach). Since some fraction of the partners' refunds is arguably derived from the tainted fees, the government is entitled to discovery on this issue. The Law Firm and its partners do not need to disclose any tax information not strictly relevant to the government's argument here, and it appears that the only necessary data are the withholding and refund amounts for the relevant tax years.[44]

## V.

In summary, it is important to reiterate that this opinion resolves disclosure disputes, not disputes over whether particular assets are subject to forfeiture. While observations in the opinion may well accurately foreshadow final forfeiture decisions, no final disposition of those disputes is reached here. The government must now prepare its final proposal for forfeiture. The parties are directed to submit additional materials according to the schedule in the accompanying order, and are further advised to make every effort to resolve any additional discovery disputes

---

43. *See* 26 U.S.C. § 31 (amount withheld from wages for tax is allowed as credit against tax imposed that year).

44. As explained above, refunds paid to Lisa Kemler are not subject to discovery or forfeiture. *See supra* p. 16. And, assuming one or more part-

ners filed joint returns, the portion of the refunds constituting property of other persons, such as spouses, is also not subject to forfeiture, *see supra* p. 23, though the fact that a return is a joint one does not bar the government's discovery of information regarding the refund and withholding.

consistent with the principles outlined here. As the parties recognize, this case has gone on long enough, and there are numerous significant issues to be resolved on appeal. An expeditious end to this stage of the litigation is desirable for all parties.